Williams, J.
 

 On June 17, 1930, shortly after the noon hour, a robber wearing a handkerchief as a mask entered the bank of the defendant banking company at Macedonia, Ohio, pointed a revolver at Edith Balazs, the lady cashier who was at that time in charge of the bank, and by putting her in fear, obtained approximately $1047 of the moneys of the bank under the cashier’s charge.
 

 The robber came and went in a green Ford coupe, model T. Shortly after the robbery a green Ford coupe, model T, driven by a young man was stuck in the mud on the outskirts of Bedford, Ohio, which is on Route 8 between Cleveland, Ohio, and Macedonia, Ohio. Shortly thereafter four persons appeared on the scene, Tony Lally, Jay Campano, Andy Stefko and John Yambor. The first three were adults and Yambor was a boy of ten. Yambor got a shovel and Lally and Campano used their own car to pull the green Ford coupe out of the mud by attaching a rope to the rear axle of the green automobile. Yambor testified that the young man who drove the stalled car was Sterling Jones, the plaintiff. Stefko could not identify him as the driver and Lally and Campano did not testify.
 

 The plaintiff, early on the day of the robbery, left
 
 *344
 
 his car in Horton’s garage in Bedford for repairs and had there borrowed a model T 'Ford conpe, green in color, and there was testimony to the effect that on returning the borrowed car late on the same day he asked Mr. Black or Mr. Paine at the garage not to say anything about his haying a car of the same kind and color as that used in the robbery. There was a mark on the rear axle of the car returned by Jones such as would be made by a rope or chain that was put on a car that was pulled out of the mud; but it appears that the borrowed car had been in the ditch on another occasion about the same time and was hauled out. by a garage man.
 

 There was also evidence tending to show that the gun used by the bank robber was similar to the one carried by Sterling Jones when, previous to the bank robbery, he served as deputy marshal of Macedonia.
 

 On June 28, 1930, plaintiff was taken charge of by the officials of Macedonia for questioning. During the course of conversation he many times offered to pay back the money to the bank and asked that the matter be kept quiet. One witness who was present testified that the plaintiff said, “I did it.” The questioning went on during the afternoon and evening, and late at night, without a complete investigation of plaintiff’s whereabouts at the time of the commission of the crime, he was arrested and committed to jail where he remained until about one o’clock in the afternoon of June 29, 1930. In the course of time plaintiff was indicted on the charge but the case never came to trial, as a
 
 nolle prosequi
 
 was entered by the prosecuting attorney.
 

 The plaintiff admitted he offered to pay the money back to the bank, but maintained that the offer was made to protect his reputation.. He denied the other admissions alleged to have been made by him and adduced evidence tending to show that he did not commit
 
 *345
 
 the offense, that the information on which he was arrested was unfounded, that he was not the driver of the car that was pulled out of the mud and that he was in attendance at the. Spencerian Business College in Cleveland during the day of the crime including the noon hour, except for a brief period during which he went out for lunch.
 

 The record is voluminous. Many witnesses testified and the conflict in the evidence is marked. It is impossible to recite all the facts, and only the most important have been stated. On account of the conflicting character of the evidence adduced, this court is of the opinion there was sufficient evidence on the issues of malice and want of probable cause to require their submission to the jury, and that a final judgment should not be entered in favor of the appellant.
 

 The appellant claims that counsel for the plaintiff was guilty of misconduct requiring the granting of a new trial. This contention is urged as to one of plaintiff’s attorneys, and what is said in this opinion regarding misconduct is directed at him and him alone. The record in this case presents a good example of how a case should not be tried so far as offending counsel is concerned.
 

 In one place Mr. Gottwald said, addressing the court in the presence of the jury, “You don’t fix bonds in my dining room or at one o’clock in the morning,” and in another place, referring to a witness, he said: “I’m objecting to putting the words in his mouth. He has had plenty of schooling in chief,” and again he said, “I mean the day you claim your lousy bank was robbed, you know what I mean,” and in response to a statement of the court he said, “You never practiced law in a banker’s house, did you, or hold any court.”
 

 Other statements could be quoted but these are sufficient to show the attitude and manners of counsel involved.
 

 The record further discloses that he intimated in one
 
 *346
 
 of his questions that counsel for appellant, Mr. Howland, and one Stickler agreed to pay the witness Matthews, sergeant of the police force of Bedford, to testify in the case, although there was no evidence warranting such assumption. -This intimation, being in a question, would not be considered of great moment were it not for insinuations made by counsel during the course of argument.
 

 It appears that all of the argument of plaintiff’s counsel is not attached to.the bill of exceptions, but after argument had been commenced the stenographer was called in to report what plaintiff’s counsel said.
 

 He continued:
 

 “But just let an official of a bank take $100,000 out of the bank, and put it in his I. O. U. account, and that must be hushed up. That is different. He must be protected and nothing said about it. That is a different proposition. They are both thieves, but that is different.”
 

 “That is the kind of law enforcement you speak for in the arguments you make. And what is the difference? You never have law enforcement anywhere unless first you get honest policemen and honest public officials, and secondly, unless you apply the same rules to both kinds of criminals. I am for them, and so are you, but these defendants are not for that kind of practice. They only advocate it against somebody who is not known to them, whom they are not. interested in. He is to be persecuted. He is to be sacrificed.”
 

 This passage plainly creates the inference that the defendants were not for honest enforcement of the law, that'they approved of the taking of $100,000 from a bank by a bank official, would protect him in doing so and would hush the matter up, but that they do advocate the enforcement of the law against someone not known to them in whom they were not interested, and would persecute and sacrifice him. This is an imputation against the defendants that they approve dishon
 
 *347
 
 est practices by bank officials. It is unjust, unwarranted by tbe evidence and calculated to arouse prejudice.
 

 Later in the argument counsel for plaintiff said: “No, it is a framed-up story. It is a fixed-up story. It was perjury, either arranged for or suborned, and it cannot be anything else. * * *
 

 “It isn’t unusual for people’s minds to break down —not at all. This Ted Matthews came in here and testified — this bribe-taking officer, still on the police force, whom the Mayor of that city, eight years elected by the people there, would not believe under oath.
 

 “Mr. Yoder, chairman of the council committee, his friend, who had helped him. Is there any wonder you haven’t any law enforcement? Of course you can’t have it under those conditions. You never will have it until we straighten things out.
 

 “Some day that kind of gentry will be strung up on telephone poles, and all I have to say in that connection is, ‘May God speed the day.’ * * *
 

 “I’ll say they [referring to the Jones family] are a greater asset than the Seiberlings are in that community, and they don’t call public officials over to the Akron City Club and give them orders. They take twenty minutes talking to a dumb, stupid detective to decide twenty-five years of that boy’s life — twenty minutes. This man Seiberling commands his lackey to sign the warrant. Beers passes it over to him, and he says, ‘No, I won’t sign it, Beers, you sign it.’ Why, as has been said, if Mr. Seiberling had given the command that night, this boy Beers would have sworn out a warrant against his own mother or brother. You know that money is the master that makes the employee do things he should not do. He does it to maintain his family in the shadow of the shops of this community.
 

 “So it was done there that night in the house of Pontius Pilate. I can draw a picture painting that
 
 *348
 
 most famous trial of history, where a man was crucified because some one misunderstood what he said. There was a Judas Iscariot who betrayed the Master. Yes, that is Mr. Pryor or Ted Matthews in this case. You have all had friends of the same kind as Ted Matthews. Every man and woman has had that kind of a friend, and you know the only proper name for him. They take him from the house of the great High Priest, over to Pontius Pilate, and Pontius Pilate washes his hands, and sends him back, and then they release Barabbas, this fellow Noble, that the Burns detectives had spent three days with, who was identified as the man who drove the car. They released him, and let the robber get away, and then in twenty minutes time they try to frame it on this boy through perjury, through false testimony, through people who are not believable under oath, who are bootleggers and confessed highwaymen. Twenty minutes they took with Sterling Jones in that house at midnight, to decide his fate. * * *
 

 “There are a million 38 Colt revolvers. The story about the gun and the chicken tracks on the street, or the rope marks on the axle — just think of that. Subsequently somebody had that car mired over at Brecksville — a man named Nelson, and it went in the ditch, and the Horton Garage had to pull it out. They fixed up that story, that Lally and Campano made those rope marks on that car — that Burns detective rope mark— and it didn’t occur to him that after Sterling Jones had used it, somebody else had used it, and went in the ditch.
 

 “Just think of that piece of framing! Mr. Doolittle says in order to get witnesses to click like that, you have got to teach them. That is just what you have been doing with those witnesses. They were not only talked to, but they were coached. * * *
 

 “His first thoughts were of his mother and his sweet
 
 *349
 
 heart. He cried. In fact he choked and sobbed, and a boy who wonld not think of his mother when he was in trouble, isn’t any good. In the words of the poet, ‘If I were hanged on the highest hill, I know whose love would follow me still — Mother.’ Whether you shoot, him in France or frame him in Bedford, she is still his mother. She raised him, and, my God, he had a right to think about her and protect her name. I’m sure you are with me on that to a man, and to the last woman. You are no good if you don’t think of those who rear you. Take mother-love and the love of children for their parents out of life, and there isn’t anything else left.”
 

 Before one can be admitted to the bar in Ohio he must take an oath that he will employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth and honor, and never seek to mislead a judge or jury by any artifice or false statement of fact or law; that he will abstain from all offensive personality, and advance no fact prejudicial to the honor and-reputation of a party or witness, unless required by the justice of the cause with which he is charged. Rule XIV, Section 15, Rules of Practice of the Supreme Court of Ohio.
 

 The initiate in the practice of the law who steps from student days into his chosen profession through the medium of an oath should have a right to expect that lawyers advanced in learning and experience will themselves keep the obligation, now an ethical guide to the profession, although the oath they took on admission was not so explicit; in reality the court merely incorporated in the form of the oath certain ethical standards that were of long standing and well established.
 

 The question as to what constitutes misconduct of counsel has heretofore been under consideration by this court, and precedent is, therefore, not lacking. The proper role of the attorney at the trial table is not that
 
 *350
 
 of a contestant seeking to prevail at any cost but that of an officer of the court, whose duty is to aid in the administration of justice and assist in surrounding the trial with an air conducive to an impartial verdict.
 

 Cleveland, Painesville & Eastern Rd. Co.
 
 v.
 
 Pritschau,
 
 69 Ohio St., 438, 69 N. E., 663;
 
 Miller
 
 v.
 
 State,
 
 73 Ohio St., 195, 76 N. E., 823;
 
 Hayes
 
 v.
 
 Smith,
 
 62 Ohio St., 161, 56 N. E., 879.
 

 Conduct of plaintiff’s counsel does not measure up to the established ethical standards of the legal profession. Not all the objectional statements, made while the evidence wqs being adduced, have been heretofore specifically mentioned, but the record is measurably interlarded with side remarks of an offensive and personal character to the prejudice of the defendants. The trial judge endeavored at times to correct this abuse but of course could not entirely efface the harm. Such misconduct should be checked promptly, and, if persisted in, the court should impose discipline even to the full extent of judicial power. If the party represented by offending counsel prevails in the verdict and the result has been brought about by the latter’s misconduct to the prejudice of the opposing party, a new trial should be promptly granted.
 

 The aspersions did not cease with the taking of testimony but found a more elaborate outlet in argument, as appears from the parts quoted. Plaintiff’s counsel in addressing the jury made assertions and drew many inferences not warranted by the evidence; he, indirectly if not directly, charged opposing counsel with corruption and coaching witnesses, and maintained that the defendants and witnesses of the defendants were parties to a framed-up story; that the testimony was perjured and suborned, this charge being general in its application; in fact, the charges were made in such broad terms that not a participant in the case, connected with the defendants, escaped
 
 *351
 
 chastisement. Argument attributing base motives to the defendants generally, in a case in which there is no evidence of actual malice, goes to the extreme. Even though there may have been evidence warranting mention of some specific fact of criticism of some of the defendants, the sweeping statements of wrongdoing applying generally to all persons connected with the defense are without justification and not warranted by the evidence.
 

 It may be said unhesitatingly that these records present a case in which objection or exception to the argument of counsel for plaintiff was not necessary to raise the question of misconduct of plaintiff’s counsel.
 
 Hayes
 
 v.
 
 Smith, supra.
 
 The judge who presides over a cause is not a mere umpire; he may not sit by and allow the grossest injustice to be perpetrated without interference. It is his duty in the executive control of the trial to see that counsel do not create an atmosphere which is surcharged with passion or prejudice and in which the fair and impartial administration of justice can not be accomplished. It was the duty of the trial court to stop the argument and require counsel to proceed in an orderly and lawyer-like manner.
 

 It may arise in the mind that the only defendant now seeking a review in this court is the appellant and therefore only error prejudicial to that party is of moment. That suggestion is true; but the misconduct was sweeping and all-pervasive as to its effect upon all the opposing parties and therefore prejudicial to the appellant.
 

 The conduct of plaintiff’s counsel was reprehensible and inexcusable, and, unrebuked as it was, constituted reversible error regardless of the lack of objection.
 

 Were the damages awarded excessive and the result of passion or prejudice?
 

 It is natural to look for the source of the injustice when there is an unusually large verdict such as would
 
 *352
 
 result through passion or prejudice. Misconduct of counsel.is a rife source of exorbitant damages.
 
 Cleveland Ry. Co.
 
 v.
 
 Crooks,
 
 130 Ohio St., 255, 198 N. E., 867. It appears that the court refused to instruct the jury-on punitive damages. No doubt the trial judge took this course because there was no proof of express or actual malice. Since the question of punitive damages was not submitted to the jury, the concern is with compensatory damages only.
 

 At the time of the second trial Sterling Jones was twenty-eight years of age. The amount of $35,000 awarded by the jury would buy for the plaintiff at the age of twenty-eight years an annuity of $1499.75.per year terminating at death. This annual income, properly husbanded would be large enough to enable him to live through life without work and rear an average-sized family. It must strike the reasonable mind that the amount of the verdict is grossly out of proportion to the loss actually sustained.
 

 The fact that the trial court granted a remittitur of $15,000 is of no moment here, since a remittitur cannot legally be entered where the excessive verdict is the result of passion or prejudice.
 
 Chester Park Co.
 
 v.
 
 Schulte,
 
 120 Ohio St., 273, 166 N. E., 186.
 

 The damages were excessive and appear to have been given under the influence of passion and prejudice engendered by misconduct of counsel.
 
 Fromson & Davis Co.
 
 v.
 
 Reider, a Minor,
 
 127 Ohio St., 564, 189 N. E., 851.
 

 For the reasons given in the opinion the judgment will be reversed and the cause remanded for new trial.
 

 Judgment reversed and cause remanded.
 

 •'Weygandt, C. J., Jones, Matthias, Zimmerman and Myers, JJ., concur.