FURNIER, Admr., Appellant,

v.

DRURY et al., Appellees.

[Cite as *Furnier v. Drury*, 163 Ohio App.3d 793, 2004-Ohio-7362.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–030067.

Decided Dec. 10, 2004.

Furnier & Thomas, L.L.P., Scott R. Thomas, and Judi L. Sobecki, for appellant.

Lindhorst & Dreidame, Michael F. Lyon, and Bradley D. McPeek, for appellees.

---

DOAN, Judge.

{¶ 1} After eating a meal on April 23, 1994, Machiko Furnier complained of shortness of breath, chest pain, and pain radiating into her left arm. Her husband, James Furnier, drove her to the office of her family physician, defendant-appellee Dr. Edwin E. Gallenstein. Gallenstein advised Machiko to go directly to Providence Hospital's emergency room because he was concerned that her symptoms could be related to heart disease. Gallenstein telephoned the emergency room and informed the physician on duty, defendant-appellee Dr. Timothy W. Drury, of Machiko's symptoms.

{¶ 2} When the Furniers arrived at the emergency room, the staff took Machiko's medical history. Tests were ordered, including an electrocardiogram that showed no abnormal results. Machiko was given a gastrointestinal ("GI") cocktail. Machiko's symptoms appeared to abate after she drank the GI cocktail. She was diagnosed with esophagitis, a gastrointestinal disorder. Drury discharged Machiko with a prescription for Tagamet and with instructions to follow up with Dr. Gallenstein in a few days. Machiko took the Tagamet over the next several weeks, but on occasion she suffered from similar symptoms. Machiko saw Dr. Gallenstein three times during those weeks, and he continued to treat her for esophagitis.

{¶ 3} On the morning of May 12, 1994, Machiko again experienced shortness of breath, chest pain, and radiating arm pain. The Tagamet she took did not improve her condition. Eventually, Machiko stopped breathing. James called for emergency assistance. While he waited, James attempted mouth-to-mouth resuscitation. Paramedics arrived and noted that Machiko's heart had stopped beating. They were unable to revive her and transported her to the hospital, where she was placed on life support. Machiko died four days later.

{¶ 4} James, as administrator of Machiko's estate (hereinafter the administrator will be referred to as "Furnier," and the first names of the Furniers will be used where appropriate to differentiate between them), filed a wrongful-death and survival action against Dr. Gallenstein, Dr. Drury, and Drury's employer, defendant-appellee Qualified Emergency Specialists, Inc. ("QES") alleging that if they had properly diagnosed Machiko with coronary-artery disease and treated her accordingly, she would not have suffered a heart attack on May 12, 1994, and

she would not have died four days later. The case went to trial in 1998. Following Furnier's case-in-chief, defense counsel moved for a directed verdict in favor of all defendants. The trial court granted defense counsel's motion. Furnier appealed and we reversed the trial court's decision. We held that Furnier had presented substantial competent evidence to establish a prima facie case of medical malpractice to support the wrongful-death and survival claims.

{¶ 5} On May 8, 2000, James Furnier died. The Furniers' son, Robert, was substituted as administrator and plaintiff in the action. The retrial of the case in December 2000 resulted in a jury verdict in favor of all defendants. Furnier has appealed.

{¶ 6} The first assignment of error alleges that the trial court erred in permitting defense counsel to make improper and inflammatory arguments to the jury during opening statements to the effect that Robert Furnier, his counsel, and his experts had "manufactured" the case against the defendants.

{¶ 7} During opening statement, over objections by Furnier's counsel, defense counsel stated to the jury, "Now, I'll tell you this. I really resent, on behalf of these doctors, anybody standing up in front of this jury and telling you that these doctors, Dr. Gallenstein, who saw Mrs. Furnier 315 times, 315 times, from 1966 to 1994, that he'd just [throw] her away. Now, I submit to you, ladies and gentlemen of the jury, you're going to find something in this case. It's a fascinating case for a lot of reasons, but this is a case, I submit to you, that has been totally orchestrated by Mrs. Furnier's son, Robert, who happens to be a lawyer. * * * I don't know where I left off, but Robert Furnier is the son of Mrs. Furnier. Robert Furnier is a lawyer. He's also the administrator of the estate and the beneficiary. Robert Furnier's partner is Mr. Thomas. Robert Furnier files this lawsuit. * * * This is science, ladies and gentlemen of the jury, and I ask you, as I did when we were impaneling you, to bring to bear in this case your background, your education, your training, your instincts in this case, and you make the plaintiffs prove this case within the confines of medicine, not just throwing something up against the wall so they can get some money. * * * And, frankly, I think if [Mrs. Furnier] were here, she'd be outraged that [Dr. Gallenstein has] been sued."

{¶ 8} Regarding Furnier's experts, defense counsel stated to the jury, "Let's start first with what I expect to see; the three alleged experts they're going to bring into this courtroom to try to prove this case, all three of whom work for a professional expert service. The name that you'll hear in this trial is Elliott Stone. Sounds like a movie star, but he's not. He's a lawyer from New York who developed, some years ago, a panel where he would get expert medical people to contract with lawyers so they could file lawsuits against doctors and present testimony. Elliott Stone is the one who brought and found these three

experts that you're going to hear: Dr. Siegel, Dr. McTague, and it's Dr. Ferentz. You will hear the testimony of Dr. Ferentz, this guy from Baltimore. He will tell you that at least 80 times he's contracted with Elliott Stone to give testimony in cases, and Dr. Siegel, this cardiologist from New York, and Dr. McTague, who's the emergency room doctor, will tell you that he's in law school, he's going to be a lawyer. * * * And they're going to bring into this courtroom, through these transcripts, three individuals who have been paid to tell you that [D]octors Gallenstein and Drury made a mistake, and that mistake did something to Mrs. Furnier."

{¶ 9} "[T]he function of an opening statement by counsel in a jury trial is to inform the jury in a concise and orderly way of the nature of the case and the questions involved, and to outline the facts intended to be proved. * * * Counsel should be accorded latitude by the trial court in making his opening statement, but when he deliberately attempts to influence and sway the jury by a recital of matters foreign to the case, which matters he knows or ought to know cannot be shown by competent or admissible evidence, or when he makes a statement through accident, inadvertence or misconception which is improper and patently harmful to the opposing side, it may constitute the basis for ordering a new trial or for the reversal by a reviewing court of a judgment favorable to the party represented by such counsel." See *Maggio v. Cleveland* (1949), 151 Ohio St. 136, 38 O.O. 578, 84 N.E.2d 912, paragraphs one and two of the syllabus.

{¶ 10} "Remarks which are not warranted by the evidence and are designed to arouse passion or prejudice to the extent that there is a substantial likelihood that the jury may be misled may constitute prejudicial error." See *Jones v. Olcese* (1991), 75 Ohio App.3d 34, 598 N.E.2d 853. "When argument spills into disparagement not based on any evidence, it is improper." See *Clark v. Doe* (1997), 119 Ohio App.3d 296, 695 N.E.2d 276, citing *Cusumano v. Pepsi–Cola Bottling Co.* (1967), 9 Ohio App.2d 105, 38 O.O.2d 132, 223 N.E.2d 477. Counsel is obligated to refrain from unwarranted attacks on opposing counsel, the opposing party, and the witnesses. See *Jones v. Macedonia–Northfield Banking Co.* (1937), 132 Ohio St. 341, 8 O.O. 108, 7 N.E.2d 544; *Dillon v. Bundy* (1991), 72 Ohio App.3d 767, 596 N.E.2d 500. It is the trial court's duty to see that counsel's statements are confined to proper limits. See *Clark v. Doe,* supra. Abusive comments directed at opposing counsel, the opposing party, and the opposing party's witnesses should not be permitted. See *Pesek v. Univ. Neurologists Assn., Inc.* (2000), 87 Ohio St.3d 495, 721 N.E.2d 1011. If there is room for doubt about whether counsel's improper remarks may have influenced the outcome of the case, that doubt should be resolved in favor of the losing party. See id.

{¶ 11} In the instant case, defense counsel's message to the jury was clear: lawyer Robert Furnier used his wiles to orchestrate or manufacture a baseless

lawsuit against his mother's doctors in order to get money. Defense counsel implied to the jury that Robert Furnier and his counsel went to another lawyer in New York in order to find medical experts who would assist in building a baseless lawsuit against Machiko Furnier's doctors. Defense counsel went so far as to suggest that Machiko Furnier would have been "outraged" at her son's conduct.

{¶ 12} We point out that Machiko's husband, James, as administrator, originally filed the lawsuit against his wife's doctors. Robert was merely substituted as administrator and plaintiff when his father died. There is no evidence in the record to suggest that Robert Furnier or anyone else "orchestrated" or "manufactured" a frivolous lawsuit. To the contrary, we held in the prior appeal that Furnier had presented substantial competent evidence to establish a prima facie case of medical malpractice.

{¶ 13} Defense counsel's remarks were clearly designed to arouse the jury's passion and prejudice. The remarks were improper and beyond the bounds of permissible argument. See *Clark v. Doe*, supra, 119 Ohio App.3d 296, 695 N.E.2d 276. We hold that the trial court abused its discretion in overruling Furnier's counsel's objections to defense counsel's opening statement. We recognize that Furnier's counsel did not object to all of the remarks that defense counsel made about Furnier's experts, but the additional remarks enhanced the prejudicial effect of the remarks to which Furnier's counsel did object. In light of all the other prejudicial remarks to which Furnier's counsel objected, after reviewing defense counsel's opening statement as a whole, we hold that there was a substantial likelihood that the jury was misled and that the verdict was influenced by defense counsel's improper remarks. The first assignment of error is sustained.

{¶ 14} The second assignment of error alleges that the trial court erred in allowing defense expert Dr. Paul Hirsh to change his testimony about the cause of Machiko Furnier's death.

{¶ 15} In the first trial, when defense counsel asked Dr. Hirsh whether Mrs. Furnier suffered a pulmonary embolism, Hirsh answered, "I think it's not a very likely possibility." When defense counsel again asked Hirsh if he had an opinion whether Machiko Furnier was experiencing a pulmonary embolism on the morning of May 12, 1994, Hirsh said, "I think it's just as likely as not."

{¶ 16} Prior to the second trial, Furnier filed a motion in limine to preclude Dr. Hirsh from testifying that a pulmonary embolism had caused Machiko's death, because Hirsh had stated in the first trial that he could not offer that opinion to a reasonable degree of medical probability as required by *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532. In arguing the motion in limine,

Furnier's counsel stated that if the defense witness was going to change his testimony for the second trial, then the motion was "premature."

{¶ 17} During the second trial, when defense counsel asked Hirsh whether Machiko Furnier's death was caused by a pulmonary embolism, Hirsh stated, "It absolutely was, I think. No question about it." No objection was raised to Hirsh's testimony. Furnier's counsel thoroughly cross-examined Hirsh regarding the differences between his testimony in the first and second trials.

{¶ 18} By failing to object to Hirsh's testimony at the second trial, Furnier waived any error in its admission. Further, the inconsistencies in Hirsh's testimony were thoroughly explored by Furnier's counsel during Hirsh's cross-examination. The second assignment of error is overruled.

{¶ 19} The third assignment of error alleges that the trial court erred in preventing Furnier's counsel from cross-examining Dr. Hirsh about whether he had the same insurance carrier as the defendants.

{¶ 20} Prior to his cross-examination of Hirsh, and outside the presence of the jury, Furnier's counsel stated to the trial court, "I intend to ask Dr. Hirsh whether he's insured or whether his company, Comprehensive Cardiology Consultants, is insured by Medical Protective, the company that insures the defendants, because I believe it's relevant to show bias under Rule 411, and I wanted to do that out of the presence of the jury." The court refused to allow Furnier's counsel to question Hirsh about his insurance carrier.

{¶ 21} An expert's bias and pecuniary interest are fair subjects for cross-examination. See *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 24 O.O.3d 322, 436 N.E.2d 1008; *Clark v. Doe*, supra, 119 Ohio App.3d 296, 695 N.E.2d 276. In *Ede v. Atrium S. OB–GYN, Inc.* (1994), 71 Ohio St.3d 124, 642 N.E.2d 365, syllabus, the Ohio Supreme Court stated, "In a medical malpractice action, evidence of a commonality of insurance interests between a defendant and an expert witness is sufficiently probative of the expert's bias as to clearly outweigh any potential prejudice evidence of insurance might cause."

{¶ 22} There is no evidence in the record as to the identity of the defendants' insurance carriers. Therefore, we cannot determine whether the trial court committed prejudicial error in failing to allow Furnier's counsel to question Hirsh about his insurance carrier. If, upon retrial, Furnier can establish that Hirsh has the same insurance carrier as the defendants, plaintiff's counsel must be permitted to cross-examine Hirsh on the issue within the bounds of *Ede*, 71 Ohio St.3d 124, 642 N.E.2d 365. Based upon the state of the record, the third assignment of error is overruled.

{¶ 23} The fourth assignment of error alleges that the trial court erred by prohibiting Furnier's counsel from cross-examining defense expert Dr. Norman Schneiderman about his testimony in other cases in order to impeach his credibility.

{¶ 24} Out of the presence of the jury, Furnier's counsel proffered, "Had the court not ruled in granting defense's objection, plaintiff would have offered evidence that this witness, Dr. Schneiderman, has testified as an expert witness for the defense in the case of Estate of Andrea Williams versus Franciscan Health Systems in which he was named as an expert on behalf of Dr. Drury and on behalf of defendant Quality Emergency Specialists, Inc., and that the attorney who called them was Mr. Lyon, and that he testified in favor of Dr. Drury.

{¶ 25} "That, further, that he was called as an expert witness for the defense in the case of Michael Hutchinson versus Dr. Babard, another emergency room physician, in a case involving chest pain at rest, in which he gave—the witness gave testimony conflicting with his testimony in these proceedings in numerous respects, not limited to the proper use of a GI cocktail, the diagnosis of a hiatal hernia with gastric reflux, that he was named by an attorney—by Mr. Lyon again, that Mr. Lyon also named Dr. Hirsh in that case.

{¶ 26} "That, further, that this witness was named as an expert by Mr. Lyon on behalf of Dr. Knochel, an employee of QES, as well as QES as defendant, his employer.

{¶ 27} "And in the case of the Estate of Michael Hobing versus Dr. Knochel and others in Montgomery County, and that he gave opinions in that case which were contrary, directly contrary to the testimony that he's given in this case, again with respect to the treatment of a patient who presented in the ER with chest pain in a three-day history of on and off chest pain after exertion wherein the exertion was discounted by the expert witness on the stand in this case, that in his testimony that Dr. Knochel met the standard of care, even though an enzyme test was abnormal and not repeated, and that the EKG was abnormal, despite these factors, that contradicts or is contradictory of his testimony in this case, including his testimony that nitroglycerin should not be used for ruling [sic] coronary artery disease."

{¶ 28} Furnier's counsel argued that the evidence elicited would have borne directly on Dr. Schneiderman's bias, his credibility, and the weight that the jury would have afforded his testimony. The trial court stated that it would allow plaintiff's counsel to question Schneiderman only about "how many times he has testified, and in regards to association with [defense counsel] and his firm." The trial court refused to allow plaintiff's counsel to question Schneiderman about any of the other issues because the court did not want "mini trials of other cases within this trial."

{¶ 29} We are unable to determine from the record whether the trial court erred in refusing to allow Furnier to cross-examine Schneiderman on his prior, allegedly inconsistent testimony, because Schneiderman's prior testimony is not in the record, and, therefore, we cannot say whether it was inconsistent with his trial testimony in the instant case. We point out, however, that the court erred in its blanket refusal to allow Furnier to cross-examine Schneiderman in this area. If Schneiderman's prior testimony was inconsistent with his testimony in this trial, plaintiff's counsel had a right to cross-examine him on the inconsistencies. See Evid.R. 613. The fourth assignment of error is sustained to the extent that it challenges the trial court's blanket refusal to allow Furnier to cross-examine Schneiderman on the allegedly inconsistent statements, but overruled to the extent that specific error is not demonstrated in the record.

{¶ 30} The fifth assignment of error alleges that the trial court erred in refusing to allow plaintiff to read the deposition of Dr. Gallenstein into evidence on rebuttal. The fifth assignment of error is overruled because Dr. Gallenstein's deposition testimony did not rebut any matters raised by the defense in its case. Gallenstein's testimony should have been presented in the plaintiff's case-in-chief. The trial court did not err in refusing to allow plaintiff to read Gallenstein's deposition on rebuttal, because it was not proper rebuttal testimony.

{¶ 31} The sixth assignment of error, which alleges that the trial court erred in failing to instruct the jury that the defendants had the burden of proof as to Machiko Furnier's diminished life expectancy, is overruled because the jury returned a verdict for the defendants, and, therefore, plaintiff cannot show any prejudice resulting from the trial court's failure to give the instruction.

{¶ 32} The judgment of the trial court is reversed and the cause is remanded for a new trial and for further proceeding consistent with law and this decision.

Judgment reversed
and cause remanded.

WINKLER, P.J., and PAINTER, J., concur.