THAMANN, Admr., Appellant,

v.

BARTISH et al., Appellees.

[Cite as *Thamann v. Bartish*, 167 Ohio App.3d 620, 2006-Ohio-3346.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–040097.

Decided June 30, 2006.

John Metz and Benjamin M. Maraan II, for appellant.

Lindhorst & Dreidame Co., L.P.A., Michael F. Lyon, and Bradley D. McPeek, for appellees.

SUNDERMANN, Judge.

## Factual and Procedural History

{¶ 1} On Friday, January 26, 1996, Dr. Lawrence Bartish performed a laparoscopic cholecystectomy on the decedent, twenty-three-year-old Meredith Thamann, to remove her gall bladder and some gall stones. Meredith was discharged from the hospital later that day. Over the weekend, Meredith was very lethargic and nauseous.

{¶ 2} By Monday, January 29, Meredith's condition had worsened. She was vomiting profusely and was short of breath. That afternoon, Meredith's husband, Brian Thamann, called Dr. Bartish. Dr. Bartish told Brian to take Meredith to the emergency room at Providence Hospital. They arrived at the emergency room around 4:30 p.m. Dr. Bartish arrived ten minutes later.

{¶ 3} Dr. Bartish and Dr. Elie Zayyat, a surgical resident, assumed Meredith's care. Dr. Bartish determined that Meredith was suffering from septic shock due

to an infection related to her surgery. Over the next six hours, Dr. Bartish treated Meredith for septic shock, but her condition kept deteriorating. Around 10:45 p.m., Meredith went into cardiac arrest and died. An autopsy revealed that Meredith had died from pulmonary emboli, multiple blood clots that had built up in her lungs and had blocked her blood supply.

{¶ 4} Plaintiff-appellant Brian Thamann in his individual capacity and as the administrator of the estate of his late wife, Meredith Thamann, filed a complaint for wrongful death and medical malpractice against defendants-appellees, Lawrence Bartish, M.D., and his employer, Queen City General and Vascular Surgeons, Inc. Following a two-and-a-half-week trial, the jury returned a verdict for Dr. Bartish and his employer. Thamann subsequently moved for a new trial, which the trial court denied. Thamann now appeals, raising eleven assignments of error. Finding merit in his first assignment of error, we reverse the judgment of the trial court and remand this cause for a new trial.

## Improper Comments by Defense Counsel

{¶ 5} In his first assignment of error, Thamann contends that the trial court erred in permitting defense counsel to repeatedly make improper and inflammatory comments to the jury throughout the trial. Thamann contends that even though he did not object to most of the comments, defense counsel's comments were so abusive and grossly improper that the trial court should have intervened sua sponte to admonish defense counsel and to correct the prejudicial effect of the comments. We agree.

{¶ 6} The Ohio Supreme Court has held that "[t]he proper role of an attorney at the trial table is not that of a contestant seeking to prevail at any cost but that of an officer of the court, whose duty is to aid in the administration of justice and assist in surrounding the trial with an air conducive to an impartial judgment."[1] When trial counsel makes inappropriate comments and engages in abusive tactics throughout a trial, those comments and tactics undermine the fairness and impartial administration of justice.[2] "[Trial] counsel is obligated to refrain from unwarranted attacks on opposing counsel, the opposing party, and the witnesses."[3]

---

**1.** *Jones v. Macedonia–Northfield Banking Co.* (1937), 132 Ohio St. 341, 349–350, 8 O.O. 108, 7 N.E.2d 544.

**2.** *Fehrenbach v. O'Malley*, 164 Ohio App.3d 80, 2005-Ohio-5554, 841 N.E.2d 350, at ¶ 23, citing *Pesek v. Univ. Neurologists Assn., Inc.* (2000), 87 Ohio St.3d 495, 721 N.E.2d 1011.

**3.** *Furnier v. Drury*, 163 Ohio App.3d 793, 2004-Ohio-7362, 840 N.E.2d 1082, at ¶ 10, citing *Jones*, supra, at 350–351, 8 O.O. 108, 7 N.E.2d 544; see, also, *Jones v. Olcese* (1991), 75 Ohio App.3d 34, 40, 598 N.E.2d 853.

{¶ 7} "[W]hen [trial counsel] deliberately attempts to influence and sway the jury by a recital of matters foreign to the case, which matters he knows or ought to know cannot be shown by competent or admissible evidence, or when he makes a statement through accident, inadvertence or misconception which is improper and patently harmful to the opposing side, it may constitute the basis for ordering a new trial or for the reversal by a reviewing court of a judgment favorable to the party represented by such counsel."[4] "It is the trial court's duty to see that [trial] counsel's statements are confined to proper limits and to prohibit counsel from creating an atmosphere of passion and prejudice or misleading the jury."[5] "Abusive comments directed at opposing counsel, the opposing party, and the opposing party's witnesses should not be permitted."[6] "If there is room for doubt about whether counsel's improper remarks may have influenced the outcome of the case, that doubt should be resolved in favor of the losing party."[7]

{¶ 8} In this case, the record reveals that defense counsel consciously engaged throughout the trial in a pattern of misconduct that was designed to inflame the jury's passion and prejudice. Defense counsel told the jurors that plaintiff's witnesses, plaintiff's counsel, and their expert witnesses had manipulated them and lied to them in order to win a big verdict. Additionally, defense counsel urged the jury to render a verdict for Dr. Bartish not because his conduct was above the standard of care, but because he was a "good doctor" who had never left the decedent's side and because he had done the best that he could in treating the decedent.

**Voir Dire**

{¶ 9} The record shows that even before the jury was seated, defense counsel began laying out his "good doctor" theme to the jury. For example, defense counsel told the prospective jurors that "[t]here [wa]s no way to get around the fact this is a solemn, serious situation. Can't get around it. And so because of that, because of my responsibility representing this good doctor, I have to ask you questions that make you a little uncomfortable."

---

4. *Maggio v. Cleveland* (1949), 151 Ohio St. 136, 38 O.O. 578, 84 N.E.2d 912, paragraph two of the syllabus; see, also, *Drake v. Caterpillar Tractor Co.* (1984), 15 Ohio St.3d 346, 15 OBR 468, 474 N.E.2d 291 (applying the holding in *Maggio* to closing arguments).

5. *Roetenberger v. Christ Hosp.*, 163 Ohio App.3d 555, 2005-Ohio-5205, 839 N.E.2d 441, at ¶ 9, citing *Clark v. Doe* (1997), 119 Ohio App.3d 296, 307, 695 N.E.2d 276.

6. Id., citing *Pesek*, 87 Ohio St.3d 495, 721 N.E.2d 1011.

7. Id.

{¶ 10} Later on in voir dire, defense counsel again told the jury, "One thing you're going to see, ladies and gentlemen in this trial, you're not going to be able to point your finger at any one entity, any one individual and say that's the bad person, that's the bad thing." When plaintiff's counsel objected, the trial court sustained the objection but did not instruct the jury to disregard the statement.

## Opening Statement

{¶ 11} Defense counsel's efforts to engender sympathy for Dr. Bartish continued in his opening statement to the jury. He told the jury, "Now Dr. Bartish didn't ask for this. He did not ask to be in this courtroom. [S]o* * * the niceties to some extent are over here. * * * [T]he evidence in this case is that he's being criticized for never having left her side."

{¶ 12} Defense counsel then asked the jurors if Dr. Bartish and his staff had "ignore[d] [Meredith], did * * * just not care, or were just stupid?" Then he told them that "the answer to those questions is absolutely no. This was a physician who laid his hands on her, who did his best, who met his patient at the emergency room, and never left her side, did the best he could based on what he saw when he was there. * * * That's what he is and that's who he is, and I'm very, very proud to represent this man. * * * But this good doctor did not cause this woman's death. This good doctor did exactly what he could and should have done under the circumstances. And that you must, you must say no, he did not do anything wrong."

{¶ 13} In addition to his sympathy theme, defense counsel laid the foundation for another recurrent theme throughout the trial, namely, the denigration of the plaintiff, his counsel, and their expert witnesses. "The evidence will demonstrate that there are only three people, three individuals in this case who thought Dr. Bartish and all his team should have thought pulmonary embolism. And those three people are the three individual experts or doctors, if you will, that they're going to bring into the courtroom starting tomorrow. And you're going to ask yourself, well, why, why? And the answer is because these three doctors who evaluated this case, allegedly fairly, they read the autopsy and they worked backwards * * * with an autopsy report in his hand drinking coffee in his office getting paid by the hour to come in here and testify as a plaintiff's expert."

## Examination of Witnesses

{¶ 14} During the examination and cross-examination of witnesses, defense counsel again made remarks designed to arouse the jury's passion and prejudice. Sometimes these remarks were in the form of speaking objections, and sometimes they were in the form of questions in which defense counsel made long speeches during cross-examination to buttress his case and then concluded with a mundane question. For example, in his cross-examination of plaintiff's expert

witness, Dr. Panacek, defense counsel stated, "Let's get back to Dr. Bartish. He's going through this process. He thinks, well, maybe there's peritonitis. Maybe there's some problem in the abdomen. Maybe there's infection causing this. She has an elevated temperature, et cetera. They take the bile out. He gave oxygen did he not?" Dr. Panacek replied, "They gave oxygen."

{¶ 15} Even more disturbing than these long speeches, however, was the sheer amount of contempt defense counsel displayed toward plaintiff's witnesses. For example, when he stood up to cross-examine Patty Potts, the decedent's aunt, who had been crying on the stand, defense counsel asked her if she wanted a glass of water. He then asked, "Would you like some of our water or some of their water? You probably don't trust our water."

{¶ 16} Counsel's inflammatory comments continued during his cross-examination of plaintiff's witnesses. In particular, defense counsel displayed contemptuous behavior towards the plaintiff's expert witnesses. Defense counsel told one of the plaintiff's experts, Dr. Kenneth Williams, that he was "playing games."

{¶ 17} And when defense counsel was permitted over objection to bring up the fact that plaintiff's second expert, Dr. Jeffrey Snow, had settled a case involving a pulmonary embolism, defense counsel proceeded to chide Dr. Snow, over the plaintiff's objection, that he was not negligent in that case. Defense counsel also chided Dr. Panacek during cross-examination, often interjecting his own comments to undercut Dr. Panacek's qualifications.

{¶ 18} "Q. I don't understand a thing you just said * * *.

{¶ 19} "Q. It's interesting you say that because your name is on this. You told us this is one of the reasons why you think you're qualified to be here. * * *

{¶ 20} "Q. Let's read from the same one so you're not confused. * * *

{¶ 21} "Q. Maybe we can get you to understand here. * * *

{¶ 22} "Q. How many hours have you spent on this case looking at the record, talking to [plaintiff's counsel] * * * including thinking about it * * * dreaming about it?

{¶ 23} "A. Dreaming about it."

{¶ 24} During his cross-examination of this same expert, Dr. Panacek, the following exchange took place, which again highlights defense counsel's demeanor toward plaintiff's expert witnesses.

{¶ 25} "Q. There are an estimated 650,000 cases per year in the United States and 200,000 deaths. Is that accurate?

{¶ 26} "A. Well, the problem is—

{¶ 27} "Q. Yes or no, is that accurate?

{¶ 28} "A. It's yes and no.  Well, sir—

{¶ 29} "[Plaintiffs Counsel]: Your Honor, may he been [sic] * * * allowed to answer.

{¶ 30} "Q. I've got a paper.  I think I can cross-examine him about this paper that he has his name on that he's represented in his CV as one of the reasons why he can be here today and I think I can ask him these questions without being interrupted.

{¶ 31} "THE COURT: I think that's fair.  I do want to suggest to the doctor, you do have to answer.  If you have an explanation, you can give that."

{¶ 32} In another exchange with Dr. Panacek, defense counsel remarked, "If you don't understand that question I'm not going to waste your time with it.  So you think you're in as good a position as Dr. Bartish to tell this jury?"  When Dr. Panacek replied that he did not say that, defense counsel replied, "Don't answer before I finish."

**Closing Argument**

{¶ 33} Counsel continued this same pattern of inflammatory remarks in his closing argument.  Defense counsel again attacked Thamann, his counsel, and their expert witnesses.  Defense counsel accused them of lying to the jurors and manipulating them so they could win money at the expense of Dr. Bartish.

{¶ 34} "A half lie is worse than a whole lie.  I submit to you that from the first witness in this case, Brian Thamann, until the last question asked in this trial yesterday * * * we see a continuous pattern of behavior on the part of the plaintiffs in this case that is half-truths, manipulations, taking things out of context, attempting to create something that is not there, a case for purposes of winning a lot of money from you.  * * * Now what is going on here?  That's the first of numerous examples of manipulations, of half-truths, out of context in this whole case.  * * * We find out that it's an attempt to manipulate you.  Not me, you.  Why? Because they want to win money at the expense of this good doctor.

{¶ 35} "To take this situation like this and to hire three doctors—we'll talk about them in a moment—to have them come into this courtroom and to give the kind of testimony they gave in an attempt to create a case against a physician who was doing everything in his power to save the life of a young woman merely for the purpose of winning all kinds of money so he can get married next week and live happily ever after—you might think this man is nasty, lawyer thing, whatever—I think it's wrong.  It's wrong.  * * *

{¶ 36} "These three people that came in here and told you how easy it was, especially [plaintiff's expert Dr.] Panacek.  * * * It's ridiculous.  * * * The fact [is] they bring in these people who've been found by these expert witness groups

to say what they want them to say. What did the plaintiff's expert, Dr. [Kenneth] Williams's character say to you? I couldn't believe it. He sits up here and says to you Dr. Bartish was wrong, he should have turned her over to the emergency department. I promise you that if Dr. Bartish had turned her over to the emergency department and she died of a pulmonary embolism, which she would have, he'd be in here criticizing him for turning her over to the emergency department. There's no doubt in my mind. No doubt in my mind." * * *

{¶ 37} "I'll let you be the judge of [Dr.] Ken Williams. I could hardly get an answer out of this guy. * * * Dr. Snow, I liked him. He was the only honest guy that came in here for the plaintiffs. * * * Then you get to my favorite, [Dr.] Panacek. Very clever guy, very glib, funny guy * * * he teaches this to his students as the classic example of pulmonary embolus. I find that unbelievably absurd and so intellectually disingenuous it made me sick.

{¶ 38} "For those people to sit on the witness stand here and take 35 hours over a five-year period to review this stuff and come in here and say the things they do and point the finger at Dr. Bartish and say it's so easy, I think is wrong * * * It's one thing and one thing only, so you'll walk back in here, whenever you do, and give a lot of all kinds of money to these people. That's what it's for.

{¶ 39} "Would you want to base a verdict against this good physician on this kind of garbage? * * * I submit to you that would be a tragedy in and of itself to do that to this man.* * * If you want to find a verdict against this good doctor based on this kind of disingenuous half truths, bought and sold testimony, that's your business. I don't think you will. You're too smart. You're too smart."

{¶ 40} Defense counsel even attacked Dr. Leopold Buerger, the pathologist who performed Meredith's autopsy, in his closing argument. "Let me say one thing about Dr. Buerger. May I? He was an insult to the medical profession. Total insult to the medical profession in my view. He was a disparaging, insulting, repulsive witness who talked about the decedent in a manner in which I've never in my twenty-eight years seen. It was horrible. Absolutely horrible. There's no excuse for that testimony. No excuse for him saying the things he did."

{¶ 41} In addition to the inflammatory and abusive comments about the plaintiff, his counsel, and their expert witnesses, defense counsel once again asked the jury to sympathize with Dr. Bartish and to render a verdict for him if he had done the best that he could. During his closing argument, defense counsel told the jury, "Make no mistake about it. This is not an ATM machine sitting at the table. * * * [H]e's a human being. He's not a bank. There hasn't been one scintilla of expression in this courtroom for two weeks, not one, how this man felt when this patient died. Not one expression about Dr. Bartish and how he felt.

* * *[O]n the verge of tears at times * * * because this man profoundly has pain.* * * Now in our system if you point a finger at a doctor like this and you accuse him of causing the death of a young woman, there's nothing light about this. And there's blood being spilled because they're accusing him of causing the death of this young lady. Do you think they don't care about him? * * * This good doctor did not cause this woman's death. This good doctor did exactly what he could and should have done under the circumstances. And that you must, you must say, no, he did not do anything wrong." When plaintiff's counsel objected to these comments, defense counsel remarked, "They don't care about him." The trial court overruled the objection, told the jury that it must make those decisions about the facts, and then directed defense counsel to continue.

{¶ 42} And continue defense counsel did. In addition to maligning the plaintiff and the expert witnesses, defense counsel also improperly opined on the credibility of his own witnesses, telling the jury that his experts were more credible than the plaintiff's experts because they "are physicians who are in there trying to help and fix people every day. They're not these paid individuals who belong to Ellen Rybeck's expert witness group." With respect to one particular defense expert, he told the jury that this expert " * * * Jim Kennealy came in here and he testifies, only he's from this community * * * He comes in here and perjures himself for Dr. Bartish? I doubt it. It's hardly worth that."

{¶ 43} Defense counsel ended his closing argument with a veiled threat to the members of the jury, informing them that they should not complain about the quality of the medical care in their community if they rendered a verdict for the plaintiffs. "You're going to carry a verdict. You're going to go back in this jury room and decide the case. When you come back out here you won't be able to hide from me and you won't be able to hide from Dr. Bartish. But most importantly, you won't be able to hide from your own heart and soul. You'll have to carry back into this courtroom and you'll be known by the thing you carry and this your verdict. You'll be known by it.

{¶ 44} "Here's the beauty of this. * * * Your verdict in this case will speak for the community, just the eight of you. Your verdict will talk, if you will. It will express what you feel about this type of case in this situation and what you think of the practice of medicine * * *. We all stand around sometimes complaining about certain things and complaining about problems in life and we read the newspaper about situations that take place. And we hear about the situations of other people. But here's one of those times in your life, the eight of you, this is one of those times you may not like it, it may be very difficult, but the fact is here's one of those times in life where you have to draw a line and have to take a position. And don't complain at some cocktail party two weeks or five

years from now about what's going on in our society, you have your chance right now to talk about this and reach a verdict."

**Analysis**

{¶ 45} Defense counsel's strategy in this case was clear. He sought to arouse the jury's passion and prejudice by repeatedly making improper remarks about the plaintiff, his counsel, and their expert witnesses. Defense counsel insinuated throughout his cross-examination of the plaintiff's witnesses that the witnesses and plaintiff's counsel were playing games. In his closing argument, he repeatedly told the jury that they had engaged in lies, manipulations, and half-truths in order to manipulate the jury into awarding the plaintiff a big verdict.[8]

{¶ 46} Moreover, defense counsel's comments to the jury to consider only whether Dr. Bartish had done his best were extremely pervasive and prejudicial to the plaintiff's case.[9] These comments misled the jury away from considering the proper legal standard, the care of a reasonably prudent physician, to considering only whether Dr. Bartish personally did his best.[10] Additionally prejudicial were defense counsel's threats to the members of the jury, informing them that they should not complain about the quality of the medical care in their community if they rendered a verdict for the plaintiff.[11] Most disturbing to this court, however, is that this particular defense counsel has utilized these exact same inflammatory and grossly abusive comments in three other medical-malpractice cases.[12]

{¶ 47} While we recognize that many of defense counsel's comments, in and of themselves, were not that egregious, when viewed in their entirety, they demonstrate a pattern of misconduct by defense counsel that warrants reversal. Moreover, given the pervasiveness of defense counsel's comments, we are convinced that the trial court's cautionary instructions to the jury before opening and closing arguments, and the few objections it sustained, had little effect, if any, in erasing counsel's comments from the jury's consideration. Because there was a

---

8.  See *Furnier,* 163 Ohio App.3d 793, 2004-Ohio-7362, 840 N.E.2d 1082, at ¶ 6–13; *Roetenberger,* 163 Ohio App.3d 555, 2005-Ohio-5205, 839 N.E.2d 441, at ¶ 5–12; *Fehrenbach,* 164 Ohio App.3d 80, 2005-Ohio-5554, 841 N.E.2d 350, at ¶ 16, 17, and 25.

9.  *Roetenberger,* supra, at ¶ 5, 6, and 10; *Fehrenbach,* supra, at ¶ 18, 19, and 27.

10. See *Kurzner v. Sanders* (1993), 89 Ohio App.3d 674, 680–681, 627 N.E.2d 564 (in which this court recognized that "a doctor can indeed be exercising his best clinical care and still be negligent").

11. See *Roetenberger,* supra, at ¶ 5, 6, and 10; *Fehrenbach,* supra, at ¶ 20.

12. We have previously criticized these same types of comments by defense counsel. See *Furnier,* supra; *Roetenberger,* supra; *Fehrenbach,* supra.

substantial likelihood that the jury was misled and that the verdict was influenced by defense counsel's improper and inflammatory remarks, we sustain Thamann's first assignment of error. We, therefore, reverse the trial court's judgment and remand this cause for further proceedings. Our decision renders moot Thamann's remaining assignments of error, in which he challenges the jury's selection, the jury instructions, and various evidentiary rulings that were made throughout the trial, and we, therefore, do not address them.

Judgment reversed<br>and cause remanded.

HENDON, J., concurs.

GORMAN, P.J., dissents.

GORMAN, Presiding Judge, dissenting.

{¶ 48} I dissent. Despite this court's statements that "[w]e are reluctant to reverse a case because of improper closing argument," to the exclusion of Thamann's other assigned errors, the majority focuses solely on the opening statement and closing argument by Dr. Bartish's counsel to overturn a jury verdict reached after two and one-half weeks of trial.[13]

{¶ 49} Following this court's recent trend in *Roetenberger v. Christ Hosp.,*[14] *Fehrenbach v. O'Malley,*[15] and *Furnier v. Drury,*[16] the majority struggles to find a bright-line test or to impose Marquis of Queensberry rules to restrain counsel in medical-malpractice trials. The effect of our decisions, however, is to elevate the otherwise laudable goals of civility and professionalism above the traditional requirement of overturning a jury's verdict only where counsel's comments, properly preserved by a timely objection, affect the outcome of the trial.

{¶ 50} To overturn a jury's verdict due to counsel's remarks in opening statement or closing argument, to which there was no objection, invites "sandbagging." Trial counsel can sit on his hands, gambling that the verdict will be favorable. If not, on appeal, counsel can argue that the remarks were so disparaging and outrageous that the jury's verdict must be overturned.

{¶ 51} The issue for the jury here was whether Dr. Bartish negligently failed to diagnose and treat a pulmonary embolism from the symptoms that Meredith

---

13. *Clark v. Doe* (1997), 119 Ohio App.3d 296, 307, 695 N.E.2d 276.

14. 163 Ohio App.3d 555, 2005-Ohio-5205, 839 N.E.2d 441.

15. 164 Ohio App.3d 80, 2005-Ohio-5554, 841 N.E.2d 350.

16. 163 Ohio App.3d 793, 2004-Ohio-7362, 840 N.E.2d 1082.

Thamann presented in the emergency room. The evidence was undisputed that 75 percent of the deaths caused by a pulmonary embolism are not discovered until there is an autopsy.

{¶ 52} There was but one lone objection during the 39 pages of closing argument by Dr. Bartish's counsel. The common-law waiver doctrine, adopted by the Ohio Supreme Court, requires that a timely objection be made to improper remarks so that the trial court may take proper action, including the giving of a curative instruction.[17]

{¶ 53} Statements that counsel did not object to are waived unless they are plain error. The doctrine originated in criminal law and permits an appellate court to notice errors affecting substantial rights that were not brought to the attention of the trial court.[18] A party in a civil case does not have the Sixth Amendment protections of a criminal defendant.[19] Thus, it is the law in Ohio that "[i]n appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." [20]

{¶ 54} In addition to failing to recognize the limitations of unobjected-to error, the majority castigates Dr. Bartish's counsel for his harsh comments. But context matters. The majority has identified the comment that the plaintiffs told the jury "half truths" as a key basis for concluding that Dr. Bartish's counsel disparaged Mr. Thamann, his counsel, and his experts. The transcript, however, shows that it was Mr. Thamann's counsel who first used the phrase in closing argument, saying "again, there's an old saying half a truth is worse than a whole lie." Dr. Bartish's comments were made to rebut Mr. Thamann's claim.

{¶ 55} For example, on direct examination, Mr. Thamann had presented himself as a man left to struggle on, in his counsel's phrase, as "Mr. Mom" for his eight-year-old daughter since the death of his wife. In closing argument, Dr.

17. See *Pfeifer v. Jones & Laughlin Steel Corp.* (C.A.3, 1982), 678 F.2d 453, 457, fn. 1, vacated on other grounds, sub nom. *Jones & Laughlin Steel Corp. v. Pfeifer* (1983), 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768; see, also, *Snyder v. Stanford* (1968), 15 Ohio St.2d 31, 44 O.O.2d 18, 238 N.E.2d 563, paragraph one of the syllabus; *Bowden v. Annenberg*, 1st Dist. No. C–040499, 2005-Ohio-6515, 2005 WL 3338935, at ¶ 31.

18. See *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 121, 679 N.E.2d 1099; see, also, Crim.R. 52(B).

19. See *Goldfuss v. Davidson*, 79 Ohio St.3d at 126, 679 N.E.2d 1099 (Cook, J., concurring in judgment only); see, also, *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240.

20. *Goldfuss v. Davidson*, syllabus.

Bartish's counsel argued that this profile was only part of the truth of Mr. Thamann's situation. Counsel noted that it was not until the cross-examination of Mr. Thamann that he disclosed to the jury that, for three years, he had been living with a 26–year–old woman and that they had had a child together. He also admitted that he had postponed their impending marriage until after the trial. Counsel's "half truth" statement was within the bounds of fair argument, because he was commenting on the evidence—that Mr. Thamann told the jury only part of the truth, and that the rest of the story had to be dragged from him on cross-examination.

{¶ 56} The majority is also concerned that Dr. Bartish's counsel exceeded the bounds of acceptable argument by directing abusive comments at Mr. Thamann's experts in closing argument. The purpose of these comments was to differentiate the testimony of Dr. Bartish's expert witnesses—practicing physicians working regularly in the operating room—from Mr. Thamann's expert witnesses—physicians hired from a group that was in the business of providing expert testimony in malpractice trials. An expert's bias and pecuniary interests and the limitations of his opinion are appropriate subjects for cross-examination and comment.[21]

{¶ 57} The majority castigates Dr. Bartish's counsel for his harsh comments about Dr. Buerger's professionalism. But the deposition testimony, read into the record, reveals that Dr. Buerger, the pathologist, repeatedly and needlessly commented on how fat Meredith was. He also admitted that he had not autopsied her legs to search for deep-vein thromboses—conditions that Mr. Thamann's experts stated were almost always the cause of pulmonary embolism. Moreover, the deposition was not conducted by Dr. Bartish's trial counsel, but by counsel no longer in the case.

{¶ 58} An appellate court should recognize that disparagement of an expert witness is not determined by how rough the cross-examination is or how withering the closing argument seems to one reading the transcript. Only " '[w]hen argument spills into disparagement *not based on any evidence,* is it improper.' "[22] The majority agrees that counsel must be afforded wide latitude during opening statement and closing argument as long as the remarks are based on the evidence.[23] But a reviewing court cannot easily discern the limits of that latitude from a cold record. This task is made more difficult when trial counsel

---

21. See *Clark v. Doe,* 119 Ohio App.3d 296, 306, 695 N.E.2d 276.

22. (Emphasis added.) *Fehrenbach v. O'Malley,* 164 Ohio App.3d 80, 2005-Ohio-5554, 841 N.E.2d 350, at ¶ 25, quoting *Clark v. Doe,* 119 Ohio App.3d at 307, 695 N.E.2d 276.

23. See *Pesek v. Univ. Neurologists Assn., Inc.* (2000), 87 Ohio St.3d at 501, 721 N.E.2d 1011.

has failed to raise a timely objection to "specific acts or omissions by the trial court constituting legal error, * * * properly suggested as error to the trial court."[24]

{¶ 59} An additional hurdle to appellate review of the case is the difficulty of reconciling the civil plain-error doctrine codified in the syllabus paragraph of *Goldfuss* and the analysis in *Pesek*. In *Pesek*, the Supreme Court appeared to impose a duty on the trial court to intervene sua sponte to admonish counsel and to take curative action.[25] The court said that, on review, we should be guided by the principle that "if 'there is room for doubt, whether the verdict was rendered upon the evidence, or may have been influenced by improper remarks of counsel, that doubt should be resolved in favor of the defeated party.' "[26] Acknowledging that the "line between forceful advocacy and unacceptable conduct is sometimes obscure," the Supreme Court concluded that any error should be resolved on the side of professionalism.[27]

{¶ 60} But this open-ended test is at odds with the plain-error rule in civil cases requiring exceptional circumstances that challenge the legitimacy of the underlying judicial process before reversal. Furthermore, in every medical-malpractice case, something has gone terribly wrong in an operating room or a doctor's office, but not necessarily as the result of medical negligence. Accordingly, under the subjective standard of *Pesek*, there would always be "room for doubt" that counsel's comment influenced the jury, whether objected to or not.

{¶ 61} As harsh as some of the comments by counsel for Dr. Bartish may have sounded to the jury, the judicial system was not a casualty in this case. The remarks that the majority calls into question, when examined in context rather than as isolated comments strung together to make a worst-case scenario, were based on the evidence in the record or were squarely within recognized limits for challenging the foundation for the opinions of Mr. Thamann's experts.

{¶ 62} I suggest that this court's recent trend toward overturning defense jury verdicts in medical-malpractice cases by focusing on counsel's use of taboo words, to the exclusion of all else, places the court on a slippery slope. Appellate courts should look to whether counsel's unobjected-to comments in closing argument constitute misconduct or merely reflect representation "zealously within the

---

24. *Pfeifer v. Jones & Laughlin Steel Corp.*, 678 F.2d at 457, fn. 1.

25. *Pesek* (2000), 87 Ohio St.3d at 501–502, 721 N.E.2d 1011.

26. Id. at 502, 721 N.E.2d 1011, quoting *Warder, Bushnell & Glessner Co. v. Jacobs* (1898), 58 Ohio St. 77, 85, 50 N.E. 97.

27. Id. at 503, 721 N.E.2d 1011.

bounds of the law." [28] A reviewing court should be guided by the following: (1) although counsel has wide latitude during closing argument, statements and inferences not warranted by the evidence create an atmosphere of passion or prejudice and inflame the minds of the jurors; [29] (2) before reversal of a jury verdict, counsel's remarks must be so prejudicial that an appropriate curative instruction cannot eliminate the probability that the remarks affected the jury's verdict; (3) whether counsel's remarks, such as appeals to racial, ethnic, or religious bias, so unfairly affected the trial that, if left uncorrected, they would undermine the integrity and public confidence in the jury system; [30] (4) whether the misconduct, no matter how improper or unethical, affected the outcome of the trial; and (5) reversal does not simply provide the court a method to deal with a lawyer's unprofessional conduct.[31]

{¶ 63} I cannot imagine that public confidence in the jury system will be undermined if we follow Ohio law and enforce the waiver doctrine when an appellant's experienced trial counsel, specializing in medical-malpractice cases, does not object to opposing counsel's remarks on the evidence in the opening statement or closing argument.

---

28. See EC 7–1.

29. See DR 7–106 and EC 7–19, 7–24, and 7–25.

30. See *Goldfuss*, 79 Ohio St.3d at 121, 679 N.E.2d 1099.

31. See *Murphy v. Internatl. Robotic Sys. Inc.* (Fla.2000), 766 So.2d 1010, 1029.