[This opinion has been published in *Ohio Official Reports* at 87 Ohio St.3d 495.]

PESEK, APPELLANT, ET AL. *v*. UNIVERSITY NEUROLOGISTS ASSOCIATION, INC. ET AL.; KLEIN ET AL., APPELLEES.

[Cite as *Pesek v. Univ. Neurologists Assn., Inc.*, 2000-Ohio-483.]

*Physicians—Torts—Medical malpractice—Jury instructions—"Different methods" charge to jury appropriate, when.*

In medical malpractice cases, the "different methods" charge to the jury is appropriate only if there is evidence that more than one method of diagnosis or treatment is acceptable for a particular medical condition.

(No. 98-238—Submitted September 21, 1999—Decided January 19, 2000.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 71637.

————————————

{¶ 1} In November 1990, Caitlin Marie Pesek was born at Meridia Hillcrest Hospital. Shortly after her birth, Caitlin became tremulous, which indicated a possible seizure disorder. She was given phenobarbital and transferred to Rainbow Babies' and Children's Hospital ("Rainbow"). In the admission report, a resident of Rainbow suggested pyridoxine (vitamin B-6) dependency as a possible cause for neonatal seizures. Following her admission, Caitlin underwent electroencephalogram ("EEG") and ultrasound examinations of her head. The results of the ultrasound were normal; the EEG showed abnormalities. A CT scan was also performed, and it "raised the question of a possible midline problem of the corpus callosum." The corpus callosum is a band of fibers connecting the left and right cerebral hemispheres. Appellee Dr. Samuel J. Horwitz, a pediatric neurologist at Rainbow, concluded that Caitlin had suffered a seizure. On November 18, 1990, Caitlin was discharged from the hospital.

{¶ 2} Thereafter, Caitlin appeared to be developing normally until February 1991, when her seizures returned. She was again taken to Rainbow. During this

stay, Caitlin experienced multiple seizures and underwent a magnetic resonance image scan ("MRI"). Dr. Charles F. Lanzieri, a pediatric neuroradiologist, examined Caitlin's MRI results and concluded that Caitlin had agenesis (absence or incomplete development) of the corpus callosum. A hospital report noted that the MRI "showed definite agenesis of the corpus callosum with some evidence of cortical atrophy especially anteriorly." Caitlin responded to phenobarbital, and she was discharged from the hospital to continue on the phenobarbital. The final diagnosis was "Seizure disorder" and "Agenesis corpus callosum."

**{¶ 3}** In March 1991, Caitlin began to suffer again from seizures, and she was again admitted to Rainbow. This time her seizures occurred more frequently and were longer. Caitlin was given phenobarbital, Dilantin, Tegretol, and Valium. However, she did not respond to the drugs. At one point, Caitlin stopped breathing, her heart rate accelerated to a high level, and a "code" was called. She went into "status epilepticus" and was transferred to the hospital's pediatric intensive care unit. Appellee Dr. Susan Klein, a pediatric neurologist, and one of Caitlin's treating physicians at Rainbow, described status epilepticus as continuous seizures lasting twenty or thirty minutes. Caitlin was placed into pentobarbital comas to control the seizures. She was also given Solu-Medrol and valproic acid in an attempt to control her condition.

**{¶ 4}** On March 20, 1991, at the request of Caitlin's parents, a second opinion regarding Caitlin's condition was rendered by Dr. A. David Rothner, a pediatric neurologist from the Cleveland Clinic. He examined Caitlin at Rainbow, reviewed her medical history and a prior scan of her head, and questioned the diagnosis of agenesis of the corpus callosum. Rothner suggested that Caitlin be given, among other things, vitamin B-6. Thereafter, Caitlin had another MRI, which revealed a corpus callosum. The MRI confirmed that Lanzieri's previous diagnosis of agenesis of the corpus callosum had been wrong.

**{¶ 5}** In early April 1991, still in the hospital, Caitlin again experienced

2

seizures. She was given vitamin B-6, and her seizures stopped. She was eventually discharged from Rainbow with treatment with vitamin B-6 to continue. The medical discharge summary report noted that Caitlin had suffered from "Grand mal status epilepticus," "Pyridoxine dependent seizures," "Gastrointestinal hemorrhage secondary to ulcerative esophagitis and gastritis," "Pneumonia," and "Anemia secondary to gastrointestinal hemorrhage requiring blood transfusion."

{¶ 6} Caitlin suffered severe brain damage. She temporarily became cortically blind. At trial, Caitlin was approximately six years old. She could not talk, she had difficulty walking, and she had to wear diapers. Caitlin will never be able to live independently.

{¶ 7} On March 26, 1993, appellant, Renee Pesek, Caitlin's mother, individually and on behalf of Caitlin, and Caitlin's father, James Pesek, filed a medical malpractice complaint in the Cuyahoga County Court of Common Pleas. In the complaint, the plaintiffs named as defendants Drs. Lanzieri, Horwitz, and Klein, University Neurologists Association, Inc. ("University Neurologists"), University Hospitals of Cleveland ("University Hospitals"), and other doctors and organizations.

{¶ 8} Before trial, plaintiffs dismissed or settled their claims against some of the defendants. The case eventually proceeded to trial against Horwitz, Klein, and University Neurologists.

{¶ 9} At trial, plaintiffs attempted to demonstrate that Horwitz and Klein had been negligent in failing to administer vitamin B-6 to Caitlin. According to plaintiffs' expert witness, Dr. Arthur L. Prensky, if Caitlin had received vitamin B-6 at critical times during the March 1991 stay at Rainbow, the vitamin would have prevented most or all of Caitlin's irreversible brain damage. The defendants, on the other hand, contended that their care and treatment of Caitlin was proper, given Lanzieri's misdiagnosis of agenesis of the corpus callosum.

{¶ 10} At the close of plaintiffs' case-in-chief, the trial court granted a

motion for directed verdict in favor of University Neurologists, which was not appealed. At the conclusion of the trial, the jury found in favor of appellees Horwitz and Klein. In response to interrogatories, the jury concluded that the "cognizable event" occurred before August 28, 1991, indicating that the individual claims of Renee and James Pesek against appellees were barred by the applicable statute of limitations. The jury also returned a verdict in favor of appellees with respect to the claims brought by appellant Renee Pesek on behalf of Caitlin.

{¶ 11} The trial court entered judgment in accordance with the jury's verdict. Upon appeal, the court of appeals affirmed the judgment of the trial court.

{¶ 12} The cause is now before this court upon the allowance of a discretionary appeal.

_____

*James G. Corrigan*, for appellant Renee Pesek.

*Weston, Hurd, Fallon, Paisley & Howley, L.L.P*., and *Stephen D. Walters*, for appellees.

_____

**DOUGLAS, J.**

{¶ 13} Appellant challenges the judgment of the court of appeals on two grounds. Appellant contends that the case should be reversed and remanded for a new trial because the trial court erred in its charge to the jury and because of the misconduct of appellees' counsel during his closing argument. For the reasons that follow, we reverse the judgment of the court of appeals and remand the cause for a new trial.

I

{¶ 14} As part of their proposed jury instructions, appellees requested that the court charge the jury on a "school of thought."[1] Over appellant's objection, the court instructed the jury as follows:

"Although some doctors, especially of these defendant's [*sic*] plight [*sic*, 'might'] have used a different method of diagnosis or treatment or procedures from these [*sic*] used by the defendant this circumstance will not by itself without more prove that the defendant was negligent. The mere fact that the defendant used an alternative method of diagnosis or treatment is not by itself without more proof of things. You are to decide whether the diagnosis or treatment or procedure used by a defendant was reasonably careful, cautio[u]s and prudent and in accordance with the standard of care required of a doctor in this field of practice."

{¶ 15} The model for the trial court's charge to the jury is found in 3 Ohio Jury Instructions (1996) 163-164, Section 331.02, Paragraph 3, which provides:

"DIFFERENT METHODS. Although some other (physician) (surgeon) (in the specialty) might have used a method of (diagnosis) (treatment) (procedure) different from that used by defendant, this circumstance will not by itself, without more, prove that defendant was negligent. The mere fact that the defendant used an alternative method of (diagnosis) (treatment) (procedure) is not by itself, without more, proof of his negligence. You are to decide whether the (diagnosis) (treatment) (procedure) used by defendant was reasonably (careful) (cautious) (prudent) and in accordance with the standard of care required of a (physician) (surgeon) (specialist) in his field of practice."

{¶ 16} This instruction informs the jury that alternative methods can be

---

1. Appellees' proposed jury instruction number seven, entitled "School of Thought," stated:

"Although some other physician might have used a method or course of treatment different from that used by Dr. Klein and Dr. Horwitz, this circumstance will not by itself prove negligence. You are to decide whether the treatment used by Dr. Klein and/or Dr. Horwitz was reasonable and in accordance with the standard of care."

used and that the selection of one method over the other is not in and of itself negligence. See *Clark v. Doe* (1997), 119 Ohio App.3d 296, 302, 695 N.E.2d 276, 280. The instruction is grounded "on the principle that juries, with their limited medical knowledge, should not be forced to decide which of two acceptable treatments should have been performed by a defendant physician." Dailey, The Two Schools of Thought and Informed Consent Doctrines in Pennsylvania: A Model for Integration (1994), 98 Dickinson L.Rev. 713.

**{¶ 17}** This type of jury instruction, however, is not appropriate in all medical malpractice cases. It is well established that the trial court may not instruct the jury if there is no evidence to support an issue. *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828, 832, citing *Riley v. Cincinnati* (1976), 46 Ohio St.2d 287, 75 O.O.2d 331, 348 N.E.2d 135. By its very terms, in medical malpractice cases, the "different methods" charge to the jury is appropriate only if there is evidence that more than one method of diagnosis or treatment is acceptable for a particular medical condition.

**{¶ 18}** Appellant contends that the trial court erred in giving the instruction on different methods or schools of thought because there was no evidence that an alternative method existed for the treatment of Caitlin's condition. Appellees disagree and point to testimony of appellant's expert witness, Dr. Prensky.[2]

---

2. When questioned by counsel for the defense on cross-examination, Dr. Prensky testified as follows:

"Q    Now, you've heard of the concept of school of thought, correct?
"A    Well, I've heard of that concept.
"Q    Right. That's where two physicians can look at the same patient and the same clinical scenario yet determine there are two different routes to take in the treatment of that particular patient, correct?
"A    I wouldn't call that school of thought but that certainly can happen.
"Q    That can happen and it has happened to you, has it not, in your practice.
"A    Sure.
" * * *
"Q    And if two physicians disagree on how to treat a physician [*sic*, patient] that doesn't necessarily mean that one of the two is below standard of care, correct?
"A    Not necessarily.

{¶ 19} However, we find that the trial court erred in giving the instruction in question. The trial court's instruction would have been appropriate had there been testimony that acceptable alternative methods existed for treatment of Caitlin's condition. There were, however, no acceptable alternative methods of treatment. The only method of treating Caitlin's medical problem was the administration of vitamin B-6. The experts were unanimous that when a child has a seizure disorder caused by vitamin B-6 dependency, the only proper treatment is to give vitamin B-6. They disagreed only on whether appellees should have recognized the condition and administered vitamin B-6 in a timely manner. Appellees' decision not to give Caitlin vitamin B-6, based upon Lanzieri's misdiagnosis, cannot be considered an acceptable alternative method for treating the child. Thus, because the instruction "probably misled the jury in a matter substantially affecting the complaining party's substantial rights," *Becker v. Lake Cty. Mem. Hosp. W.* (1990), 53 Ohio St.3d 202, 208, 560 N.E.2d 165, 171, a new trial is warranted.

II

{¶ 20} Appellant also contends that the trial court abused its discretion in allowing appellees' trial counsel to make inappropriate and prejudicial comments

---

"Q      All right. And you would agree that there are really are [*sic*] no topics in medication, especially pediatric neurology where you would get across the board agreement by every pediatric neurologist, correct?

"A      Absolutely.

"Q      All right. And that applies to all conditions, including the rare condition of Pyridoxine dependency, correct?

"A      All conditions.

"Q      All right. And it would not shock you in this case if a pediatric neurologist would not have used vitamin B-6 on the 9th, 10th, 11th, or 12th [of March 1991], correct?

"A      It would not shock me. It would be wrong.

" * * *

"Q      The bottom line is, doctor, that while most pediatric neurologists in your opinion would have used B-6 you would at least concede that there is a minority school of thought that would not, correct?

"A      I think a minority would not have in anything as we've discussed."

during his closing argument to the jury. Although our holding in Section I disposes of this appeal, we will briefly discuss some of the inappropriate and prejudicial comments made by counsel for appellees. We do so to provide the trial court with guidance on remand and to inform the bench and bar that abusive comments directed at opposing counsel and an opposing party's expert witness during closing argument should not be permitted by any court, and that such comments can indeed be grounds for a new trial.

{¶ 21} Appellant challenges the following comments made by appellees' trial counsel during his closing argument:

"MR. FARCHIONE: * * * This is a misrepresentation. A deliberate — and there are a lot of deliberate misrepresentations in this case and we're going to go through any number of them.

" * * *

" * * * They sought out Dr. Peterson first. They used this testimony as a club to get a settlement with Dr. Lanzieri and the radiologists because this is what Dr. Peterson had to say.

"What Mr. Corrigan did following that settlement should raise feelings of disgust in you. Disgust that the legal system would allow this to happen and disgust at Mr. Corrigan as an attorney.

"MR. CORRIGAN: Objection, your Honor.

"THE COURT: Overruled.

" * * *

"MR. FARCIONE: I find that very sad that he [Corrigan] would be in this courtroom in this case asking for 18 million dollars in damages and he would stand behind your back over here and laugh, folks. Actually I'm not too surprised because it fits in with everything that's been going on with this case. The half-truths, the untruths, the threatening of witnesses, the suppression of evidence. It fits Mr. Corrigan's personality."

{¶ 22} Appellant also points to comments made by counsel for appellees regarding appellant's expert witness, Dr. Prensky:

"MR. FARCHIONE: After they get the settlement with Dr. Lanzieri what happens? 'Well, we can't put this case on with Dr. Peterson so let's threaten him with a lawsuit if he comes into Ohio so he can't come in live. Let's go out and find a second-class expert. Someone who failed the boards, bought his way into pediatric neurology and received 40 percent of his income from testifying. Let's find someone like that to screw over these good doctors. And then let's read Dr. Peterson's depo, those little portions that help us.'

" * * *

" * * * Now, what does that say about his role here? He's trying to earn that 40 percent to keep his standard of living up higher because he has a reputation to maintain a typical presentation of B-6 dependency."

{¶ 23} Appellant contends that these comments and others were "so prejudicial as to influence the jury beyond the bounds of normal argument." Appellant, however, did not object at trial to most of the above and other complained-of comments made by appellees' counsel. Nevertheless, appellant contends that the trial court should have intervened *sua sponte* to admonish counsel and correct the prejudicial effect of the misconduct. We agree.

{¶ 24} We acknowledge that counsel should be afforded great latitude in closing argument, *State v. Champion* (1924), 109 Ohio St. 281, 289, 142 N.E. 141, 143, and that the determination of whether the bounds of permissible argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court, *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph three of the syllabus. Therefore, the trial court's determination will not be reversed absent an abuse of discretion. *Id.* However, "[w]here *gross* and *abusive* conduct occurs, the trial court is *bound, sua sponte, to correct the prejudicial effect of counsel's misconduct.*" (Emphasis *sic.*) *Snyder v. Stanford* (1968), 15 Ohio

St.2d 31, 37, 44 O.O.2d 18, 21, 238 N.E.2d 563, 568.    See, also, *Jones v. Macedonia-Northfield Banking Co.* (1937), 132 Ohio St. 341, 351, 8 O.O. 108, 112-113, 7 N.E.2d 544, 549:

"It may be said unhesitatingly that these records present a case in which objection or exception to the argument of counsel for plaintiff was not necessary to raise the question of misconduct of plaintiff's counsel.  The judge who presides over a cause is not a mere umpire; he may not sit by and allow the grossest injustice to be perpetrated without interference.  It is his duty in the executive control of the trial to see that counsel do not create an atmosphere which is surcharged with passion or prejudice and in which the fair and impartial administration of justice cannot be accomplished.  It was the duty of the trial court to stop argument and require counsel to proceed in an orderly and lawyer-like manner."   (Citation omitted.)

{¶ 25} Counsel for appellees made various assertions and drew many inferences that were simply not warranted by the evidence.  To attack counsel for appellant and appellant's expert witness was inexcusable, unprincipled, and clearly outside the scope of final argument.  Appellees' counsel could have zealously represented his clients without resorting to these abusive tactics.  Instead, counsel for appellees transcended the bounds of acceptable closing argument, creating an atmosphere "surcharged with passion or prejudice." *Id.*, 132 Ohio St. at 351, 8 O.O. at 113, 7 N.E.2d at 549.

{¶ 26} Accordingly, we conclude that regardless of the fact that counsel for appellant did not object to each contested comment, the conduct of appellees' counsel during his closing argument constituted reversible misconduct.  In reaching our conclusion that a new trial is warranted, we are guided by the principle that if "there is room for doubt, whether the verdict was rendered upon the evidence, or may have been influenced by improper remarks of counsel, that doubt should be resolved in favor of the defeated party." *Warder, Bushnell & Glessner Co. v.*

*Jacobs* (1898), 58 Ohio St. 77, 85, 50 N.E. 97, 99.

{¶ 27} Appellant also maintains that during closing argument counsel for appellees disregarded a previous ruling by the trial court with respect to a motion by appellant to exclude the settlement amount reached between appellant and Lanzieri and University Radiologists. Appellant claims that the comments of appellees' counsel regarding the settlement amounted to reversible misconduct. We disagree.

{¶ 28} Prior to trial, appellant moved to "keep the settlement figure and the number out of the opening statement, and out of closing arguments and away from the jury." Counsel for appellant then agreed that the jury could be informed that a settlement had been entered into with Lanzieri and University Radiologists but that the dollar figure reached in the settlement would not be disclosed to the jury. At the beginning of trial, the trial court cautioned the jury that "Dr. Lanzieri and University Radiologists are defendants. Settlement agreements were reached between the plaintiffs and those two defendants. You may not speculate about reasons for the settlement, nor the amount of the settlement."

{¶ 29} According to appellant, counsel for appellees "proceeded to lead the jury to speculate on the reasons for the settlement and the settlement amount in direct and flagrant violation of the courts [*sic*] wishes." In support, appellant points to various comments made by appellees' counsel during his closing argument.[3]

{¶ 30} However, we agree with the court of appeals that the comments made by counsel for appellees during his closing argument regarding the settlement

---

3. "MR. FARCHIONE: And it is because the diagnosis of agenesis of the corpus callosum was wrong that Dr. Lanzieri is not standing in front of you right now * * * and he [Lanzieri] has settled out of this case.

" * * *

" * * * The plaintiffs in this case have settled with the culprit. They've settled with Dr. Lanzieri. And Mr. Corrigan and these parents would not have settled for anything less than this child's financial security for the rest of her life. * * *

" * * * The individual who is at fault in this case, the individual who caused the harm in this case has settled out of this case and is not here. Now we're here simply to role [*sic*] the dice."

were not "so egregious and prejudicial that the trial court abused its discretion by failing to admonish counsel and take curative action." Appellant had agreed that a disclosure of the settlement was proper, and the jury was not specifically apprised of the dollar amount of the settlement.

{¶ 31} As a final note, in keeping with this court's efforts at promoting professionalism, we make the following general observations. We recognize the circumstances of heat of argument. We understand and accept zeal for a client. Having all been there, we know that the line between forceful advocacy and unacceptable conduct is sometimes obscure. However, none of these factors palliates misconduct when the fair administration of justice is a casualty. Given our renewed focus on the continuing need for decorum and respect for clients, each other, courts, and all other persons, if we err we should err on the side of professionalism.

{¶ 32} For the foregoing reasons, we reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded*.

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., concurs in part and dissents in part.

COOK and LUNDBERG STRATTON, JJ., dissent.

————————————

**MOYER, C.J., concurring in part and dissenting in part.**

{¶ 33} I concur in the syllabus and in the majority opinion regarding the statements of counsel for appellees during trial and the conduct of the trial judge, except that I do not concur in the conclusion that that conduct should be the basis for reversing the judgment of the court of appeals.

{¶ 34} I would affirm the judgment of the court of appeals.

---

**COOK, J., dissenting.**

{¶ 35} I disagree with the majority's framing of—and answer to—the question with respect to the jury-instruction issue. I also disagree with its conclusion that defense counsel's remarks during closing argument were so egregious as to require reversal in the absence of timely objection. Accordingly, I would affirm the judgment of the court of appeals.

## JURY INSTRUCTION

{¶ 36} The majority decides that the jury instruction on alternative methods "probably misled the jury in a matter substantially affecting the [plaintiff's] substantial rights." But I think the court *properly* instructed the jury, given the evidence presented regarding the standard of care. The majority decision turns on the observation that there was no evidence presented at trial that there was more than one acceptable way to treat an infant with "a seizure disorder caused by vitamin B-6 dependency." In my view, however, the court of appeals correctly understood the question to be whether there was evidence presented that there was more than one acceptable way to treat "an infant with intractable seizures."

{¶ 37} The majority acknowledges that "[t]he trial court's instruction would have been appropriate had there been testimony that acceptable alternative methods existed for treatment of Caitlin's condition." Plaintiff's expert testified that, given Caitlin's known symptoms, diagnosis, and medical history known to the defendants in March 1991, the standard of care required that they give Caitlin vitamin B-6 between March 11 and 13, 1991 (presumably to test for and, if present, treat B-6 dependency). Defendants' expert testified that, under the circumstances, defendants' failure to administer B-6 did not fall below the standard of care. This conflicting testimony presents the basis for instructing the jury on alternative

methods.[4]

## DEFENSE COUNSEL'S REMARKS DURING CLOSING ARGUMENT

**{¶ 38}** While I agree that the argument of defense counsel demeans the role of counsel and ought not to be condoned, I also agree with the court of appeals that, given our deference to the preferred vantage of the trial court, the remarks do not present reversible error. As the court of appeals noted, the latitude to be afforded to counsel during closing argument is within the sound discretion of the trial court.

**{¶ 39}** Furthermore, though complaining on appeal that the closing argument was clearly prejudicial, counsel failed to object,[5] triggering a plain-error review. "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, syllabus. And counsel's argument was not so egregious that it "grossly and persistently abuse[d] his privilege," *Snyder v. Stanford* (1968), 15 Ohio St.2d 31, 44 O.O.2d 18, 238 N.E.2d 563, paragraph one of the syllabus. Consequently, I disagree with the majority's conclusion that the trial court was bound to intervene despite the absence of a proper objection by plaintiff.

---

4. See, also, *Finley v. Culligan* (1996), 201 Wis.2d 611, 626, 548 N.W.2d 854, 860 (alternative-methods jury instruction proper where "evidence was in conflict, demonstrating medically alternative modes of treatment for a patient who presented [plaintiff's] symptoms and condition"); *Wasfi v. Chaddha* (1991), 218 Conn. 200, 208-209, 588 A.2d 204, 208-209 (alternative-methods jury instruction held not error where defendant otolaryngologist had offered evidence that, based on tentative but incorrect diagnosis, his chosen method of treatment was within the normal range of professional discretion exercised by competent otolaryngologists faced with same situation); and *Brackett v. Coleman* (Ala.1988), 525 So.2d 1372, 1378-1379 (with respect to defendant physician's treatment of plaintiff prior to correct diagnosis, question is whether defendant "exercised such reasonable care, skill, and diligence as a physician would ordinarily exercise in a similar case").

5. Plaintiff did object to one of defense counsel's remarks, which objection was overruled, but did not object further or make it clear that he wished to lodge a continuing objection.

CONCLUSION

{¶ 40} Because I believe that neither the trial court's alternative-methods jury instruction nor its failure to intervene *sua sponte* during defendants' closing argument constitutes reversible error, I respectfully dissent.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

_____