OPINION
{¶ 1} This medical negligence and wrongful death action was filed by Appellant, Linda S. Fearer, Administratrix of the Estate of Raymond Fearer, against Appellees, Joel Siegal, M.D., a neurosurgeon, and Humility of Mary Health Partners d/b/a St. Elizabeth Health Center. Appellant alleged that Appellees' negligence proximately caused the death of her husband, Raymond. He passed away from complications after scheduled back surgery with Dr. Siegal at St. Elizabeth Health Center.
 {¶ 2} The matter proceeded to trial and the jury found that neither defendant was negligent. Appellant filed a motion for a new trial, but the trial court denied her request. Appellant asserts six assignments of error on appeal. She argues that the trial court erred in giving the jury the instruction as to the availability of different methods of treatment. She also argues that the trial court unfairly limited the scope of Dr. Skirball's cross-examination; that the trial court erred in excluding an alleged admission against interest made by an unknown hospital nurse; that the trial court inappropriately excluded a portion of another nurse's testimony; that the trial court erred in limiting a nurse's testimony to the scope of her deposition testimony; and that Dr. Siegal's counsel created error by introducing collateral source evidence contrary to an order in limine. *Page 3 
 {¶ 3} After review of the law and evidence we hold that the trial court did not err in instructing the jury as to the availability of different methods of treatment since Appellant's experts testified that alternative methods existed for the assessment and treatment of Raymond's low blood pressure. Further, the limitations placed on Appellant's cross-examination of Dr. Skirball may have been error, but this error was harmless. The trial court also did not err in limiting the unreliable statements allegedly made by an unidentified nurse and did not err in limiting statements made by another nurse that were not based on a reasonable degree of medical certainty. As such, Appellant's assignments of error lack merit and are overruled, and the trial court's decision is affirmed in full.
 FACTS AND PROCEDURAL HISTORY {¶ 4} Raymond Fearer had a long history of neck and back problems, including prior surgeries. On September 18, 2000, he underwent scheduled back surgery for his chronic low back pain. Raymond was 49 years old at the time. Dr. Siegal performed the surgery at St. Elizabeth Health Center in Youngstown, Ohio. The surgery was successful, but Raymond lost about one liter of blood during the surgery. (Tr., p. 1132.) Raymond was to remain hospitalized for two days following the surgery.
 {¶ 5} Two days after the surgery, at approximately 4:30 a.m., a hospital nurse determined that Raymond had very low blood pressure, or hypotension; blood pressure low enough to interfere with the flow to the vital organs. The nurse did not *Page 4 
contact Dr. Siegal even though he indicated at trial that nurses would normally call for "that blood pressure." (Tr., pp. 104-105, 639.)
 {¶ 6} A nurse did, however, call Dr. Siegal following the 6:30 a.m. reading of Raymond's blood pressure, which revealed that he was still hypotensive. In response, Dr. Siegal ordered the nurses to hold the high blood pressure medication that Raymond had been taking regularly before surgery. At 8:10 a.m. Raymond reported to the nurse that he was dizzy. Dr. Siegal agreed that this symptom could have been of concern; but the nurses did not call him with this new complaint. (Tr., pp. 104-105.)
 {¶ 7} At 8:25 a.m., Dr. Siegal saw Raymond in the hospital. Siegal did not take his blood pressure, did not look at his chart, and did not talk to the nursing staff about Raymond. In fact, Dr. Siegal agreed on cross-examination that had he taken Raymond's blood pressure, he probably would not have discharged him. Dr. Siegal also indicated that had he been advised that Raymond's was feeling dizzy and sleepy, in addition to his continued hypotension, he would have not allowed his discharge. Dr. Siegal would have also had another doctor assess Raymond's hypotension. (Tr., pp. 108, 118-120.) Instead, Dr. Siegal examined Raymond's wound and had him up and walking around the room. Dr. Siegal thought that Raymond was doing very well from a surgical standpoint and could be discharged to go home. (Tr., pp. 1022-1026.)
 {¶ 8} Raymond was discharged from the hospital after 10:00 a.m. with no formal studies assessing the cause of his hypotension. His final blood pressure *Page 5 
reading before discharge was still very low. Dr. Siegal was not advised of this subsequent blood pressure reading, either. Later that day, Raymond's wife contacted Dr. Siegal indicating that Raymond was not doing well. She was instructed to bring him back to the hospital. (Tr., pp. 120-121, 916, 1026.)
 {¶ 9} Raymond's wife told hospital staff that he may have accidentally taken his son's medication, Soma with Codeine, and that he could have had a negative reaction. The next morning Dr. Siegal saw Raymond and noted in his progress notes, "`probable narcotic reaction.'" (Tr., p. 126.)
 {¶ 10} Raymond subsequently developed respiratory distress that progressed into Adult Respiratory Distress Syndrome (ARDS), which is indicative of a severe injury to the lungs. He was later intubated and placed on mechanical ventilation. Raymond died in the intensive care unit on October 6, 2000. The coroner identified the probable cause of death as, "probable narcotic reaction." (Tr., pp. 133, 637.)
 {¶ 11} Appellant filed suit seeking damages for the loss of her husband. Following discovery, this case proceeded to jury trial on March 20, 2006. Appellant's medical negligence theory was that Raymond lost significant blood during surgery resulting in his hypotension and subsequent hypovolemic shock, which in turn developed into ARDS. He died from pneumonia, a common ARDS complication. She alleged that Appellees negligently allowed her husband to be discharged from the hospital. Appellees denied that Raymond was ever in hypovolemic shock and instead argued that he died due to a negative reaction to narcotics. Although *Page 6 
Appellees did not argue that Raymond ingested narcotics before his discharge, there was testimony that narcotics can lower blood pressure. (Tr., p. 230.)
 {¶ 12} The jury returned a unanimous defense verdict and concluded in interrogatories that neither defendant was negligent. Appellant sought a new trial, but the trial court denied her request. This timely appeal followed.
 {¶ 13} Appellant's first assignment of error asserts:
 {¶ 14} "THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON DIFFERENT METHODS WHEN THAT WAS NOT AN ISSUE AT TRIAL."
 {¶ 15} Appellant argues that the trial court erred in giving the jury the "different methods" instruction as it related to Dr. Siegal's course of action when he was informed of Raymond's low blood pressure. Appellant argues that this instruction was irrelevant since she did not challenge Dr. Siegal's method of treatment; instead, she says that she based her claim on Appellees' failure to stop the decedent's discharge from the hospital and Appellees' alleged failure to utilize any method to reverse the decedent's post-operative hypotension. She claims the instruction was inappropriate and misleading.
 {¶ 16} Our standard of review when it is claimed that improper jury instructions were given is to consider the jury charge as a whole, and determine whether the charge misled the jury. Kokitka v. Ford MotorCompany (1995), 73 Ohio St.3d 89, 93, 652 N.E.2d 671. A jury is presumed to follow the instructions given it by the court. State v.Henderson (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237. *Page 7 
 {¶ 17} In the instant case, Appellant unsuccessfully objected to the "different methods" jury instruction as set forth in 3 OJI 331.01(4). The trial court advised the jury that:
 {¶ 18} "Although some other surgeon might have used a method of treatment different from that used by the defendant, this circumstance will not by itself prove that the defendant was negligent. You shall decide whether the treatment used by the defendant was in accordance with the required standard of care.
 {¶ 19} "The customary or routine method of treatment may be considered by you along with other facts and circumstances in evidence. Although a particular method may be customary, usual or routine, this circumstance will not by itself prove that method to be within the standard of care. You shall decide whether the method of treatment used by defendant was in accordance with the required standard of care." (Tr., pp. 1408-1409.)
 {¶ 20} In an objection lodged on Appellant's behalf, counsel stated:
 {¶ 21} "Plaintiff objects to three instructions. The first is the different methods instruction. The Pesek [case], P-E-S-E-K, states that under Ohio law the different methods instruction is only to be given in very limited circumstances where there are two alternately — alternate methods of treatment that both fall within the standard of care. And there's no contention in this case that there were two alternate methods of treatment. Indeed, the testimony is that either it was negligent or it wasn't negligent to let Mr. Fearer go home without — to let the decedent go home with a low blood *Page 8 
pressure without being properly evaluated. So I don't think the different methods instruction has a place in this particular case, and I think it's misleading."
 {¶ 22} Siegal's counsel stated in response:
 {¶ 23} "Your Honor, there's been ample testimony in this case that when the blood pressure was recorded as low, there are many different treatments that could have been undertaken. Dr. Siegal elected to hold the hypertension [high blood pressure] medications. That's one of the treatments that he recommended. And I believe that that — therefore, plaintiffs' experts said he could have done volume challenge, checked him again, all of that information. * * * So I believe that is a proper instruction." (Tr., pp. 1255-1257.)
 {¶ 24} It is clear that Dr. Siegal tried to correct Raymond's hypotension by taking him off of his high blood pressure medication. Appellant tends to agree that withholding Raymond's medicine was an appropriate initial response. However, Appellant argues that Dr. Siegal's response was insufficient and that he should have also referred Raymond to another physician or ordered blood work, and re-checked Raymond's blood pressure prior to his discharge.
 {¶ 25} Pesek v. University Neurologists Assn., Inc. (2001),87 Ohio St.3d 495, 499, 721 N.E.2d 1011, held that the different methods jury instruction is only appropriate if there is evidence presented that one or more method of treatment or diagnosis was acceptable for a specific medical condition. If evidence to this effect is lacking, then a new trial is warranted. Id. at 500. *Page 9 
 {¶ 26} In Pesek, the parties' experts agreed that when a child suffers from the seizures caused by a vitamin B-6 dependency, the only proper treatment is to administer vitamin B-6. The parties disagreed, however, as to whether the defendants should have recognized the condition and timely administered the requisite treatment. Id. Accordingly, the Supreme Court concluded that the different methods instruction probably misled the jury, and as such, a new trial was ordered. Id.
 {¶ 27} In Werden v. The Children's Hosp. Med. Ctr., 1st Dist. No. C-040889, 2006-Ohio-4600, the court of appeals upheld the trial court's use of the alternate methods jury instruction. It examined the arguments and evidence in support and found that the record in that case, "contained] evidence that more than one method of treatment was available for * * * anemia and typhlitis," and as such, the instruction was appropriate. Id. at ¶ 125.
 {¶ 28} However, in Fehrenbach v. O'Malley, 164 Ohio App.3d 80,2005-Ohio-5554, 841 N.E.2d 350, the court of appeals found that the different methods jury instruction was given in error. In that case there was no evidence that the physician, "had used an alternative but acceptable method to diagnose meningitis." Id. at ¶ 48. Instead, all the experts agreed that with the presentment of a patient with the plaintiff's symptoms, "the standard of care required [the doctor] to perform a blood workup and a lumbar tap to rule out meningitis and sepsis." Id. Thus, the different methods jury instruction was given in error. Nevertheless, the plaintiffs failed to *Page 10 
object at trial, and thus were found to have waived the argument on appeal. Id. at ¶ 49.
 {¶ 29} Appellant argues here that she did not take issue with Dr. Siegal's decision to hold the decedent's anti-hypertension medicine. Accordingly, she claims that the "different methods" instruction misled the jury and necessitates a new trial. However, Appellant did allege that the withholding of Raymond's high blood pressure medication was not enough in light of his continued low blood pressure.
 {¶ 30} Our review of the record reveals that there was evidence as to the different methods of treatment that Dr. Siegel could have utilized. Although Dr. Siegal's withhold order on the hypertension medicine was an appropriate response, Appellant's own expert opined that a fluid challenge could have been employed to reduce hypotension. (Tr., p. 265.)
 {¶ 31} Additionally, it is unclear if the "different methods" instruction was even directed to the initial treatment of Raymond's low blood pressure. The jury charge may have been intended to apply to Dr. Siegal's failure to re-check the decedent's blood pressure prior to his discharge. Appellant stressed the fact that Dr. Siegal failed to check Raymond's blood pressure when he evaluated Raymond prior to discharge. However, Appellant's own expert, Dr. Nearman, acknowledged that a physician can look at a patient to see if he or she "looks sick" in order to determine if they are suffering from low blood pressure. (Tr., pp. 436-437, 448.)
 {¶ 32} Appellant's other expert, Dr. Witorsch, testified that the failure to re-check Raymond's blood pressure prior to his discharge fell below the standard of *Page 11 
care. Thereafter, Dr. Witorsch stated that Dr. Siegal should have addressed the reasons why Raymond was still hypotensive, and considered whether he was hypovolemic. (Tr., pp. 264-265.)
 {¶ 33} Based on this record, the trial court did not err in providing the "different methods" jury instruction. Appellant's experts themselves testified that alternative methods existed for the initial treatment of Raymond's low blood pressure and the assessment of his blood pressure prior to his discharge. It appears that based on this record the instruction was not misleading to the jury. This assignment of error lacks merit.
 {¶ 34} In Appellant's second assignment of error she claims:
 {¶ 35} "THE TRIAL COURT ERRED IN APPLYING THE FEDERAL VERSION OF EVIDENCE RULE 611."
 {¶ 36} Appellant alleges that the trial court erred in limiting her cross-examination of St. Elizabeth Health Center's expert pulmonary specialist, Dr. David Skirball, to the extent of his direct testimony. Specifically, Appellant complains that she was not permitted to ask Dr. Skirball his opinion as to whether Appellees erred in discharging Raymond from the hospital in light of his hypotension. She alleges that Dr. Skirball opined in his deposition testimony that Appellees failed to meet acceptable standards of care in their treatment of Raymond. The trial court would not allow her to elicit this testimony at trial. In limiting her cross-examination, the trial court determined, in part, that the scope of the cross-examination of an expert is limited by the extent of his direct testimony. *Page 12 
 {¶ 37} An appellate court should not disturb a trial court's decision to admit or exclude evidence absent, "a clear and prejudicial abuse of discretion." O'Brien v. Angley (1980), 63 Ohio St.2d 159, 163,407 N.E.2d 490. The trial court's decision to admit or exclude evidence must be so arbitrary, unreasonable, or unconscionable that it warrants reversal. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 218,450 N.E.2d 1140.
 {¶ 38} Evid.R. 611(B), "Scope of cross-examination", states: "Cross-examination shall be permitted on all relevant matters and matters affecting credibility." Further, the Staff Notes to Evid.R. 611(B) provide the following analysis that was relied on by the trial court:
 {¶ 39} "Rule 611(B) and Federal Evidence Rule 611(b) stand indiametrical opposition. The federal rule limits the scope of cross-examination to the scope of direct examination with a discretion vested in the trial court to permit additional inquiry as if upon direct examination. In contrast, Rule 611(B) permits cross-examination on allrelevant matters and matters affecting credibility. * * * In * * *,Bean v. Green (1878), 33 Ohio St. 444, it was held that the admission of testimony out of time is a question directed to the discretion of the court and although an irregularity, the action of the court permitting the eliciting of evidence in chief on cross-examination did not constitute an abuse of discretion. More recently, in Cities Service OilCo. v. Burkett (1964), 176 Ohio St. 449, it was held that even thoughthe proper time for introduction of evidence in support of a litigant'sposition was during the introduction of his evidence in chief, testimony adduced on cross-examination *Page 13 
within proper limits and tending to establish the litigant's case may be allowed to stand and be considered." (Emphasis added.)
 {¶ 40} A review of the trial transcript reveals that the original objection and decision as to Dr. Skirball's testimony occurred off of the record. It is unclear whether defense counsel suggested limiting Dr. Skirball's testimony to the scope of his direct examination or whether this was an independent decision made by the trial court. (Tr., pp. 617-620.)
 {¶ 41} Appellant's counsel argued that there should be no limitations placed by the trial court on cross-examination. Counsel argued that the state and federal evidence rules vary greatly and emphasized that the Staff Notes to Evid.R. 611(B) allow a party to go beyond the scope of direct examination and ask any relevant questions. (Tr., pp. 617-618.) The trial court again denied Appellant's request stating that the, "inquiry tends to elicit facts more properly presented in your case. Therefore, I am standing on my ruling." (Tr., p. 620.)
 {¶ 42} Dr. Skirball's direct testimony revealed that he was hired by the hospital as an expert on the issue of proximate cause. He reviewed Raymond's medical records and evaluated the treatment he received. Based on his review of the evidence, Dr. Skirball testified at trial that it was his opinion, to a reasonable degree of medical certainty, that had Raymond received proper diagnosis and further treatment of his low blood pressure on the day of his discharge from the hospital, it would not have changed the outcome or his development of ARDS. In fact, Dr. Skirball felt that Raymond's ARDS was unpreventable. In other words, Raymond's *Page 14 
death was not caused by the alleged failures of Dr. Siegal and the hospital to re-check Raymond's blood pressure and stop his discharge. (Tr., pp. 653-654.)
 {¶ 43} On cross-examination, Appellant's counsel confirmed that Dr. Skirball acknowledged in his deposition testimony that Raymond had been hypotensive. Appellant's counsel began to ask Dr. Skirball whether Raymond had received "safe care," but Dr. Siegal's counsel objected, and the trial court sustained his objection. (Tr., p. 682.)
 {¶ 44} Appellant's counsel again took issue with the court's ruling, but was overruled based on a court of appeals decision from this district referred to as, "Pierson v. Watts." The court stated that "Pierson" stands for the proposition that, "cross examination is limited to the scope of direct examination." (Tr., p. 655.) However, a review of the case to which the court evidently referred, Pearson v. Wasell
(1998), 131 Ohio App.3d 700, 723 N.E.2d 609, reveals otherwise. This Court, in Pearson, analyzed the introduction of alleged prejudicial and inflammatory statements made by a medical professional as to the plaintiff's motives in pursuing treatment. We held on appeal that appellant had opened the door on direct examination to the alleged prejudicial testimony. Only in that context did we reference the scope of direct testimony in analyzing the extent of cross-examination. Id. at 707. Thus, the trial court erred in relying on Pearson to broadly hold that cross-examination was limited to the scope of direct testimony. This statement is contrary to Ohio Evid.R. 611(B) and Pearson does not stand for this proposition. *Page 15 
 {¶ 45} However, the trial court judge also relied on the Staff Notes to Evid.R. 611 in making its determination. The court explained that the Staff Notes provide as follows: "Court may limit an adverse cross examination of a witness where * * * the inquiry tends to elicit facts more properly presented in your case." (Tr., p. 620.)
 {¶ 46} Thus, notwithstanding the trial court's misguided reliance on the holding in Pearson, it does not appear that it erred in limiting Dr. Skirball's testimony in this case. As the trial court pointed out, Dr. Skirball's testimony regarding the defendant's violations of the applicable standards of care would have been more appropriately addressed during Appellant's case in chief.
 {¶ 47} Alternatively, Appellees argue that the trial court did not err in limiting Dr. Skirball's testimony since he was introduced as an expert on the issue of proximate cause, and not as to the standard of care. Appellees claim that generally a proximate cause expert cannot testify as to standard of care issues. They have not, however, directed our attention to any caselaw in support of this contention. Evid.R. 702, "Testimony by Experts," sets forth when an expert's testimony may be introduced at trial:
 {¶ 48} "A witness may testify as an expert if all of the following apply:
 {¶ 49} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 50} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; *Page 16 
 {¶ 51} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *."
 {¶ 52} In Smith v. Promedica Health System, Inc., 6th Dist. No. L-06-1333, 2007-Ohio-4189, the court of appeals addressed a comparable issue and found that although a potential medical expert witness must show that he or she is familiar with the standard of care, he or she does not have to be the best witness. Instead, the trial court in each case must determine whether an expert's knowledge, experience, skill, training, and education, "will aid the trier of fact in the search of the truth[.]" Id. at ¶ 17, citing Alexander v. Mt. Carmel Med. Ctr.
(1978), 56 Ohio St.2d 155, 157, 383 N.E.2d 564. Accordingly, Appellees' argument that a proximate cause expert cannot testify as to standard of care issues lacks merit.
 {¶ 53} Appellee, Humility of Mary Health Partners, also directs our attention to Mueller v. Lindes, 8th Dist. No. 80522, 2002-Ohio-5465, in which the plaintiff took issue with the trial court's decision to limit her cross-examination of a defense expert. Without ruling on the underlying alleged error, the court of appeals upheld the trial court's decision and found no abuse of discretion. It reasoned that the plaintiff presented other ample evidence as to whether the standard of care was satisfied by the decedent's physicians. Thus, there was no error in that case.
 {¶ 54} In the instant matter, Appellant presented several expert witnesses in support of her theories of liability. She presented the testimony of Dr. Witorsch and Nurse Robosson on the nursing standard of care, and she presented the testimony of Dr. Marks, Dr. Witorsch, and Dr. Nearman relative to Dr. Siegal's standard of care. *Page 17 
 {¶ 55} Based on the foregoing, there was no abuse of discretion in the instant matter. In spite of the trial court's generalized misstatement of the caselaw as to the scope of cross-examination, the trial court did not err in finding that standard of care opinions were better addressed during Appellant's case in chief and Appellant did, in fact, present other evidence in her case in chief on this issue. As such, this assignment of error lacks merit and is overruled.
 {¶ 56} Appellant's third assignment of error alleges:
 {¶ 57} "THE TRIAL COURT ERRED IN EXCLUDING AN ADMISSION AGAINST INTEREST BY AN EMPLOYEE OF ONE OF THE DEFENDANTS-APPELLEES."
 {¶ 58} Appellant takes issue with the trial court's decision to exclude alleged admissions against interest made by a St. Elizabeth Health Center nurse. At trial, Appellant sought to testify about statements a nurse made to her at the hospital. Specifically, Appellant claims that a nurse employed at St. Elizabeth Health Center told her that Raymond should never have been discharged with such low blood pressure. (Tr., pp. 614-615.) She argues that this statement was not hearsay, but an admission against interest by a hospital employee.
 {¶ 59} Appellant cites Evid.R. 801(D)(2)(d) in support of her argument. This rule states in part that an admission by a party-opponent is not hearsay if, "[t]he statement is offered against a party and is * * * a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship* * *." *Page 18 
 {¶ 60} In theory, Evid.R. 801(D)(2)(d) might support the alleged admission in this case. However, Appellant fails to recognize that she did not know the identity of the nurse, so this nurse could not be identified at trial. Appellees objected to this testimony since the nurse was never identified and it was unclear whether this nurse even treated Raymond.
 {¶ 61} Appellant's counsel proffered, "In asking Mrs. Fearer about what she had heard from the nurse that she knew to be employed by Saint Elizabeth Hospital and working there in the course and scope of her employment, [Appellant] would have stated that the nurse told her that [Raymond] should have never went home [sic] with the low blood pressure[.] * * * It was Plaintiffs' position that this was an admission against interest, and therefore an exception to the hearsay rule." (Tr., pp. 614-615.)
 {¶ 62} Appellant directs our attention to Tolliver v. Appleton (1990), 4th Dist. No. 1806, in support of her argument. The plaintiff had advised a nurse that he was allergic to Lidocaine, but it was allegedly erroneously administered. He sought damages for injuries sustained. The defendants filed motions for summary judgment, providing evidence that the plaintiff had not been given Lidocaine. In response, the plaintiff submitted an affidavit in which he stated that his nurse told him she was administering Lidocaine into his IV. The nurse was not identified by name. According to the affidavit, the doctor was present at the time of the nurse's statement, and he expressed shock. Id. at 1-2. *Page 19 
 {¶ 63} The court of appeals in Tolliver concluded that the statement was not inadmissible hearsay, but was, "admissible to show the truth of the statements since they were non-hearsay pursuant to Evid.R. 801(D)(a) and (d), that is, an admission by a party opponent ([the physician]) and a vicarious statement of an employee (the nurse) made within the scope of [their] employment." Id. at 5. Thus, the plaintiffs affidavit was allowed to be admitted to prevent a summary judgment determination in the matter.
 {¶ 64} The analysis in Tolliver, however, is inapplicable to the present case. The plaintiffs affidavit in Tolliver was drafted in response to a motion for summary judgment, and the defendants did not challenge the plaintiffs failure to specifically identify the nurse. The nameless nurse was identified, at least, as a nurse who actually provided care for the plaintiff. Further discovery in this matter may have revealed the nurse's actual identity.
 {¶ 65} In the instant matter, we are confronted with a question involving admission of statements into trial which were made by an unknown nurse; a nurse who may or may not have been involved in Raymond's treatment. Thus, there is no way to determine whether the statement was made in the scope of the nurse's duties at the hospital. The proffered testimony in this case is unreliable. The trial court did not abuse its discretion in excluding this testimony, and Appellant's third claimed error lacks merit and is overruled.
 {¶ 66} In Appellant's fourth assignment of error, she claims: *Page 20 
 {¶ 67} "THE TRIAL COURT ERRED IN EXCLUDING STANDARD OF CARE OPINIONS BY PLAINTIFF-APPELLANT'S NURSING EXPERT THAT WERE NOT STATED TO A REASONABLE DEGREE OF PROBABILITY."
 {¶ 68} In this assignment Appellant takes issue with the trial court's exclusion of testimony by Appellant's expert registered nurse, Teresa Robosson, based on her failure to state that she was offering her opinion based on a reasonable degree of medical probability. Robosson testified at trial by way of videotape deposition, and her testimony was transcribed and is before us on appeal.
 {¶ 69} A trial court's decision to admit or exclude evidence will be upheld absent an abuse of discretion. State v. Hymore (1967),9 Ohio St.2d 122, 128, 224 N.E.2d 126. "Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice." Urbanski v. Nuding, 6th Dist. No. L-05-1167,2006-Ohio-467, ¶ 6 citing O'Brien, supra, at 164-165, 407 N.E.2d 490.
 {¶ 70} A review of Robosson's testimony reveals that she was permitted to testify about whether the hospital nurses satisfied their standard of care to a reasonable degree of nursing probability. Robosson discussed the various ways that the nursing staff, in her opinion, failed to meet acceptable standards of care. She concluded that the nurses fell below the standard of care based on their failure to reassess and analyze Raymond's low blood pressure and to timely contact the treating physician at 4:30 a.m. (Tr., pp. 494-498.) *Page 21 
 {¶ 71} However, other testimony offered by Robosson was excluded. Contrary to Appellees' contentions, the portion of the testimony that was excluded was not identical to testimony that was earlier permitted. The excluded testimony addressed the nurses' standard of care relative to their treatment of Raymond following the 6:30 a.m. call to Dr. Siegal, and after the doctor's order to hold Raymond's antihypertension medication. The testimony was not couched in such a manner to include language that made it clear the witness was offering her opinion based on a reasonable degree of nursing probability. Hence, it was excluded. (Robosson Depo., pp. 12-13.)
 {¶ 72} The record does reflect that the essence of the objectionable testimony was essentially placed before the jury after Appellant's re-direct examination of Robosson:
 {¶ 73} "Q And was that possible finding of being sleepy and falling asleep on the phone, in conjunction with persistent hypotension, significant, persistent hypotension, was that ever brought to Dr. Siegal's attention by the nursing staff?
 {¶ 74} "A No.
 {¶ 75} "Q And, Nurse Robosson, if the nurses did part of their job, in other words, they did part of their job in calling Dr. Siegal at six-thirty and alerting him to one of the blood pressures, but didn't do another part of their job in failing to call him at nine when that blood pressure persisted in being low, and the patient developed symptoms or potentially [sic] symptoms of a low blood pressure, did they still fall blow *Page 22 
[sic] standards of care, even though they may have done part of there [sic] job at one point in time?
 {¶ 76} "A Yes." (Tr., pp. 525-526.)
 {¶ 77} Based on the foregoing, it does not appear that the trial court abused its discretion in this case. Robosson's opinions, in total, were given to the jury, albeit not as directly as Appellant would have liked. This assignment of error also lacks merit.
 {¶ 78} Appellant's fifth assignment error asserts:
 {¶ 79} "THE TRIAL COURT ERRED IN ARBITRARILY LIMITING CROSS-EXAMINATION OF DEFENDANT-APPELLEE'S EXPERT WITNESS TO STATEMENTS MADE IN DEPOSITION."
 {¶ 80} Appellant alleges that the trial court placed unconscionable limits on her cross-examination of Sophia Gardner, RN, when it limited the scope of her testimony to the answers she provided in her discovery deposition.
 {¶ 81} As earlier discussed, a trial court's decision to admit or exclude evidence will be upheld absent a clear and prejudicial abuse of discretion. State v. Hymore (1967), 9 Ohio St.2d 122, 128,224 N.E.2d 126; O'Brien, supra, at 164-165, 407 N.E.2d 490.
 {¶ 82} Evid.R. 611 states in part,
 {¶ 83} "(A) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as (1) make the interrogation and presentation effective for the ascertainment of the *Page 23 
truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.
 {¶ 84} "(B) Scope of cross-examination. Cross-examination shall be permitted on all relevant matters and matters affecting credibility."
 {¶ 85} Appellant complains that Gardner's testimony was evasive and that the trial court prevented her from inquiring into the basis of her opinion. The line of questioning at issue concerns whether a nurse meets the standard of care when he or she fails to alert the attending physician about a patient's declining blood pressure before that patient's discharge. Appellant claims that instead of answering the questions presented, Gardner quoted her prior deposition testimony. The disputed exchange follows:
 {¶ 86} "Q * * * you would agree that under those circumstances, as a reasonably careful nurse, you would — before discharging the patient, you would have alerted Dr. Siegal to this patient's condition; wouldn't you?
 {¶ 87} "A I stated that that was something I could have done, yes.
 {¶ 88} "Q Not could have done. Would you have done it?
 {¶ 89} "[DEFENSE COUNSEL]: Objection.
 {¶ 90} "THE COURT: Are you quoting her deposition?
 {¶ 91} "[APPELLANT'S COUNSEL]: No, I'm asking her to testify live in front of this jury.
 {¶ 92} "THE COURT: She testified.
 {¶ 93} "Q You would have done it: wouldn't you? *Page 24 
 {¶ 94} "[DEFENSE COUNSEL]: Objection.
 {¶ 95} "A I said I could have done it.
 {¶ 96} "THE COURT: Sustained. She answered the question.
 {¶ 97} "[APPELLANT'S COUNSEL]: Your Honor, I'm not asking her to quote her deposition. I'm asking her for her testimony today under oath. I'm not cross examining her with her deposition.
 {¶ 98} "THE COURT: She answered your question." (Tr., pp. 962-963.)
 {¶ 99} Gardner's deposition testimony reveals a comparable exchange,
 {¶ 100} "Q. No, no, I'm asking about you as a nurse, as an expert, would you have let this patient go without touching base with this physician at 9:00 in the morning when these vitals were taken?
 {¶ 101} "[Defense counsel objects]
 {¶ 102} "A. To imply that I wouldn't intervene for my patients is unrealistic because I would. However, the circumstances of this particular patient as I understand them was that approximately 25 minutes earlier a physician was there, he knew of these things, he felt that it was related to the antihypertensive and he wrote for that patient to be discharged anyway. Would it have hurt to give him a call, no, it would not have.
 {¶ 103} "Q. That's not what I asked. I asked would you have called him under the circumstances that we know, would you have called him to make sure before your patient was discharged that he was aware of that? What would you have done? *Page 25 
 {¶ 104} "[Defense counsel]: Objection.
 {¶ 105} "A. To make sure that he was aware of it?
 {¶ 106} "Q. Yes.
 {¶ 107} "A. I could have called him, yes.
 {¶ 108} "Q. And why would you do that?
 {¶ 109} "A. To make sure that he was aware of it.
 {¶ 110} "Q. Absolutely." (Gardner Depo. Tr., pp. 43-44.)
 {¶ 111} As Appellant claims, it appears that Gardner was reluctant to directly answer the question as to what she would have done; instead she indicated what she could have done. However, the trial court deemed this sufficiently responsive to the question. Contrary to Appellant's claim, Gardner does not refer to her deposition during her trial testimony. Instead, her answers were consistent with her prior statements. This record reflects that Appellant was not denied an opportunity to fully cross-examine Gardner. There was no abuse of discretion by the trial court.
 {¶ 112} In Appellant's sixth and final assignment error, she argues:
 {¶ 113} "DEFENDANT-APPELLEE CREATED ERROR BY INTRODUCING EVIDENCE OF A COLLATERAL SOURCE IN VIOLATION OF AN ORDER IN LIMINE PRECLUDING SAME."
 {¶ 114} Appellant alleges that Appellee introduced collateral source benefits at trial in violation of the trial court's ruling on a motion in limine, and that this evidence was prejudicial since it depicted Raymond as a welfare recipient who was attempting to "double dip." *Page 26 
 {¶ 115} A ruling on a motion in limine is only a preliminary interlocutory order. It allows a party to raise an objection to a potentially prejudicial question or area of inquiry before trial and limits the likelihood that prejudicial evidence will be heard by the jury. Riverside Methodist Hosp. Assn. v. Guthrie (1982),3 Ohio App.3d 308, 310, 444 N.E.2d 1358.
 {¶ 116} Appellant filed a motion in limine requesting the trial court to exclude testimony relative to collateral sources, among other issues. The motion was unopposed, and was granted in advance of trial. (March 20, 2006, Judgment Entry.) Appellant now claims that Appellee blatantly violated this ruling at trial and inquired about the decedent's collateral source benefits.
 {¶ 117} The trial transcript reveals that counsel for Appellee asked about Raymond's intention to apply for disability during cross-examination of Dr. Witorsch. In reviewing Raymond's medical records, Dr. Witorsch is asked: "Q Does that indicate that Mr. Fearer is contemplating applying for 100 percent disability? A It does." (Tr., p. 333.) Appellant's counsel did not object to this question. Thereafter, there is no other reference by Appellee to Raymond's potential disability. In fact, the words "benefits" or "compensation" were not even used.
 {¶ 118} It appears that Appellant repeatedly mentioned her husband's disability during her own testimony. She directly testified that Raymond received disability benefits from the Navy and the Veterans Administration for his bad back. On cross-examination Appellant again stated without objection that Raymond received a disability pension from the Navy. (Tr., pp. 552, 586.) *Page 27 
 {¶ 119} Appellant's failure to object to these questions at trial waives all but plain error. Crim.R. 52 (B) defines plain error as a defect affecting substantial rights that may be noticed although it was not raised at trial.
 {¶ 120} The jury in Appellant's case found that neither defendant was negligent. Thus, the jury never addressed the issue of damages. Assuming arguendo that questions were asked in violation of an order in limine, counsel did not object and any potential error was clearly harmless. This assignment of error lacks merit and is overruled.
 {¶ 121} In conclusion, Appellant's assignments of error fail in their entirety and are hereby overruled. The trial court's decision is affirmed in full.
Vukovich, J., concurs.
 DeGenaro, P.J., concurs. *Page 1