[Cite as *Hursey v. Ohio State Univ.*, 2012-Ohio-6352.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DEBORA HURSEY, et al.

    Plaintiffs

    v.

THE OHIO STATE UNIVERSITY

    Defendant

Case No. 2011-02140

Judge Dale A. Crawford

<u>DECISION</u>

{¶ 1} Debora Hursey, hereinafter "plaintiff," brought this action alleging medical negligence against The Ohio State University Medical Center (OSU). Her husband, John Hursey, asserts a claim for loss of consortium. The issues of liability and damages were bifurcated and the case was tried to the court on the issue of liability.

{¶ 2} John Hursey is a long-distance truck driver and plaintiff often travels with him across the country. On July 17, 2009, plaintiff and her husband, who are residents of Ohio, were in Billings, Montana, traveling in John Hursey's truck. It was plaintiff's birthday and plaintiff and her husband decided to spend the night at a hotel. Plaintiff was unable to sleep and on July 18, 2009, plaintiff presented at Billings Clinic Hospital (Billings) with complaints of shortness of breath and discoloration of her feet.

{¶ 3} On July 18, 2009, plaintiff underwent an echocardiogram (echo) at Billings and a report from the echo was prepared by Barbara Dudczak, M.D. Contained in the report are several conclusions, including: "1. Visual estimation of EF [ejection fraction] is <20% * * * 5. Moderate fixed thrombus on the apical wall of the left ventricle." (Joint

Exhibit A 000391.) The report further states: "Left Ventricle: Visual estimation of EF is <20%. There is a moderate apical left ventricular thrombus, which is flat (mural) in shape, solid in texture, and which is fixed." A thrombus is commonly known as a blood clot and if it embolizes it can cause life-threatening conditions. Plaintiff was treated with the anticoagulants Heparin and Coumadin while at Billings due to the indication of a left ventricle thrombus.

{¶ 4} On July 19, 2009, a heart catheterization was performed on plaintiff at Billings. The test found that plaintiff had three blood vessels to the heart that were severely damaged and depressed. Plaintiff underwent a second echo at Billings on July 23, 2009. The report, prepared by Brian Rah, M.D., contained several conclusions, including: "Visual estimation of EF is 20-25%" and "Cannot rule out LV [left ventricle] thrombus mentioned on previous study. Would consider Definity contrast if indicated." (Joint Exhibit A 000389.) The report also notes that plaintiff had moderate mitral valve regurgitation.

{¶ 5} Billings did not have the proper facilities for plaintiff to undergo heart surgery so it was decided that plaintiff would receive further treatment from defendant, OSU. On July 27, 2009, plaintiff was transferred to OSU via medical flight. At OSU, plaintiff was treated by Louis B. Louis, IV, M.D., a cardiothoracic surgeon. Throughout plaintiff's treatment and care Dr. Louis was an employee of defendant as a cardiothoracic surgeon and as an assistant professor of surgery.

{¶ 6} On July 28, 2009, Dr. Louis completed plaintiff's patient history. In his report, Dr. Louis wrote, "I personally reviewed her echocardiogram." (Joint Exhibit B 000059.) Dr. Louis testified that he cannot recall which image he reviewed, but his common practice is to look at the latest study performed. After compiling plaintiff's history, Dr. Louis determined that plaintiff had severe coronary artery disease and congestive heart failure. On July 27, 2009, Dr. Louis placed her on Heparin for anticoagulation. (Joint Exhibit B 000786.) Dr. Louis explained that the reason for the

anticoagulant was because of plaintiff's acute coronary syndrome and the possibility of a left ventricle thrombus.

{¶ 7} Plaintiff underwent an echo at OSU on July 28, 2009. The conclusions contained in the report from this echo state: "There is diffuse global hypokinesis of the left ventricle. The calculated ejection is 35% by bi-plane Simpson's Method." (Joint Exhibit B 001233.) Plaintiff also had a cardiac MRI performed on July 28, 2009. The report from the MRI, prepared by Subha Raman, M.D., indicates that plaintiff's "final diagnosis" was coronary artery disease. (Joint Exhibit B 001236.) Neither the July 28, 2009 echo nor the July 28, 2009 MRI mention a left ventricle thrombus. After reviewing these studies, Dr. Louis prepared plaintiff for coronary artery bypass grafting and mitral valve repair surgery with a left ventricle assist device (LVAD) backup. (Joint Exhibit B 000778.)

{¶ 8} Plaintiff underwent dental extractions on July 30, 2009, and after the procedure, Heparin treatment resumed and she remained on Heparin until it was stopped on August 4, 2009, in preparation for surgery. (Joint Exhibit B 000792, 000803.) Dr. Louis explained the reason for this was solely for her acute coronary syndrome because the diagnosis of the left ventricle thrombus had been eliminated.

{¶ 9} On July 31, 2009, prior to surgery, Dr. Louis discussed with plaintiff and her husband the risks, benefits, and alternatives of performing coronary artery bypass grafting and mitral valve repair with an LVAD backup. Dr. Louis stated in a progress note that plaintiff agreed to undergo the procedure and that he informed her of the risks of the surgery including a stroke. (Joint Exhibit B 000777.) Further, both Dr. Louis and plaintiff signed an informed consent form. In his own handwriting, Dr. Louis wrote that a stroke was a risk of the surgical procedure. (Plaintiffs' Exhibit 4.)

{¶ 10} On August 5, 2009, Dr. Louis performed surgery on plaintiff. She underwent a coronary artery bypass graft, mitral valve repair, and ligation of the left atrial appendage. (Joint Exhibit B 000841.) Dr. Louis testified that in preparing for

surgery he had an LVAD prepared to use, if needed, in the mitral valve repair. A cloth ring was placed around the mitral valve in the heart in order to stop the mitral valve regurgitation. Immediately prior to surgery, a transesophageal echo (TEE) was performed by the anesthesiologist in the operating room. (Joint Exhibit B 000851-000852.) The report notes that plaintiff's ejection fraction was 35-40%. There is no reference to a left ventricle thrombus in the report. Dr. Louis testified that during the surgery he did not see a left ventricle thrombus. No complications arose during the surgery and a LVAD did not need to be implanted.

{¶ 11} After surgery on August 6, 2009, plaintiff was administered Heparin to prevent deep venous thrombosis (Joint Exhibit B 000813). Dr. Louis testified that plaintiff did quite well after the surgery. On August 11, 2009, she underwent a post-operative echo. One of the conclusions contained in the report from that echo states, "Not all LV segments well visualized" and the report also notes that the ejection fraction was 55-60%. (Joint Exhibit B 001231). There was no finding of a left ventricle thrombus.

{¶ 12} Plaintiff was discharged from OSU on August 11, 2009. She was not prescribed Coumadin or any other anticoagulant. However, both plaintiff and her husband recalled watching a video at OSU about Coumadin. John Hursey also testified that when he realized that plaintiff was not prescribed Coumadin, he called OSU and was informed that Dr. Louis did not think plaintiff needed to be on Coumadin.

{¶ 13} On August 14, 2009, plaintiff woke up and noticed that something was wrong. She went to Southeastern Ohio Regional Medical Center (Southeastern) in Cambridge, Ohio, where she learned that she had suffered a stroke. Plaintiff suffered a second stroke while at Southeastern at which time she became unable to speak. She was then transferred to OSU and was treated by Dr. Louis.

{¶ 14} A neurological examination was performed upon plaintiff at OSU, and it is noted in the report that plaintiff "has had a shower of emboli most likely from a cardiac

source." (Joint Exhibit B 000104.) On August 18, 2009, plaintiff had a TEE. The report conclusions state, in part, "No obvious source of cardiac embolus identified. * * * No LV thrombus noted." (Joint Exhibit B 000619.) Dr. Louis placed plaintiff on Coumadin, with the indication being an embolic stroke. After plaintiff was discharged from OSU, she underwent rehabilitation at OSU's Dodd Hall. Plaintiff has been prescribed and has taken Coumadin up until the time of trial.

{¶ 15} "[I]n order to establish medical [negligence], it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions or circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 131 (1976).

{¶ 16} To the extent that plaintiffs allege a claim of lack of informed consent, the Supreme Court of Ohio has held that "[t]he tort of lack of informed consent is established when:

{¶ 17} "(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;

{¶ 18} "(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and

{¶ 19} "(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy. In applying this test, Ohio

adopted the reasonable-patient standard." *Nickell v. Gonzalez*, 17 Ohio St.3d 136, 139 (1985).

{¶ 20} Plaintiff presented the expert testimony of Christopher Stone, M.D., a board certified cardiothoracic surgeon practicing medicine in Kenosha, Wisconsin. Reviewing the July 18, 2009 echo from Billings, Dr. Stone testified that a left ventricle thrombus existed in the apex of the heart. Dr. Stone opined that there was a thrombus and its existence was never ruled out by OSU and that it should have been ruled out before ending plaintiff's treatment at OSU. He admitted that he could not see a thrombus on either the July 23, 2009 echo from Billings or the July 28, 2009 echo from OSU. Also, he could not see a thrombus on the TEE performed during plaintiff's surgery. He testified that the August 11, 2009 echo was extremely limited and that he could not see the area where the thrombus was located. He opined that a left ventricle thrombus existed and that the echos at OSU were insufficient to rule out such thrombus.

{¶ 21} Dr. Stone had no criticism of OSU's treatment of plaintiff up until the time of her discharge. Dr. Stone opined that the standard of care required Dr. Louis to prescribe Coumadin to plaintiff upon discharge due to the indicators of a left ventricle thrombus and the mitral valve repair. He explained that the thrombus, which he opined was never ruled out by OSU, was an "absolute" indicator to prescribe Coumadin while the mitral valve repair was a "relative" indicator. He testified that "many doctors" would anticoagulate a patient after mitral valve repair while others would not. Dr. Stone explained that the introduction of a foreign body from the mitral valve repair along with plaintiff's low ejection fraction was a reason to anticoagulate plaintiff.

{¶ 22} Dr. Stone further opined that plaintiff had a left ventricle thrombus at Billings and that the subsequent studies performed at OSU were insufficient to "rule out" the thrombus. He opined that plaintiff should have been prescribed Coumadin upon her discharge or Dr. Louis should have discussed with plaintiff why Coumadin was not

prescribed.  Dr. Stone testified that Dr. Louis breached the standard of care by failing to do this.

{¶ 23} Regarding the cause of plaintiff's August 14, 2009 stroke, Dr. Stone testified that based on the description of a "shower of emboli" contained in the August 14, 2009 neurological consultation, a clot in plaintiff's heart had embolized and caused the stroke.  Dr. Stone explained three possible causes of the embolic stroke: a blood clot forming around the mitral valve ring; Dr. Louis' failure to completely oversew the left atrial appendage; and the left ventricle thrombus.  If plaintiff had been taking Coumadin, he opined that this would have prevented the stroke.

{¶ 24} Defendant presented the expert testimony of Michael Argenziano, M.D., a board certified cardiothoracic surgeon practicing at Columbia University in New York City.  He explained that even though a left ventricle thrombus was diagnosed at Billings, later diagnostic tests performed at OSU did not show that a left ventricle thrombus existed.  While he believes there was no left ventricle thrombus while plaintiff was at Billings, Dr. Argenziano explained that whether there was a thrombus in Billings was irrelevant because the echos were repeated at OSU and showed no thrombus.

{¶ 25} Further, Dr. Argenziano opined that plaintiff did not have a left ventricle thrombus when she was discharged from OSU on August 11, 2009.  Reviewing the echos, MRI, and TEE performed at OSU, he saw no left ventricle thrombus.  He also did not see a left ventricle thrombus on plaintiff's August 18, 2009 echo, which was after her stroke.  He admitted that if plaintiff did have a left ventricle thrombus, she should have been prescribed Coumadin.

{¶ 26} Dr. Argenziano opined that defendant's conduct, including the discharge plan, was within the standard of care.  He explained that Dr. Louis' decision not to prescribe Coumadin to plaintiff upon her discharge from OSU on August 11, 2009, was within the standard of care because there was no indication that an anticoagulant should be prescribed.  He testified that a mitral valve repair is not an indicator to

prescribe Coumadin.  He testified that if plaintiff did have a left ventricle thrombus, then Coumadin should have been prescribed.  Further, he opined that while plaintiff had a low ejection fraction when she presented at OSU, her ejection fraction had raised to the normal range after surgery.

{¶ 27} Regarding the cause of plaintiff's stroke, he admitted that plaintiff suffered a stroke, but that the post-stroke echo and other studies do not show the source of the embolism.

{¶ 28} All experts opined that had plaintiff been discharged from OSU with the anticoagulant Coumadin her stroke probably would not have occurred.  This is a retrospective view of this case.  Dr. Louis' treatment cannot be judged based upon after-acquired knowledge.  *See Grabill v. Worthington Indus.,* 98 Ohio App.3d 739, 744 (10th Dist.1994).  The issue before the court is whether Dr. Louis' decision to discharge plaintiff without placing her on Coumadin was within the standard of care based upon the knowledge and information Dr. Louis had at the time of her discharge on August 11, 2009.   The court was presented with two eminently qualified cardiothoracic surgeons, Drs. Christopher Stone and Michael Argenziano.[1]   While the doctors disagreed as to whether a thrombus existed on July 18, 2009, when plaintiff was first admitted to Billings, the court finds that the evidence supports a finding that a left ventricle thrombus, as seen and read on the July 18, 2009 echo, existed in plaintiff's heart.  With this finding of direct evidence of the thrombus, plaintiff would have the court make an inference that the thrombus existed when plaintiff was admitted to OSU on July 27, 2009; make a further inference that the thrombus existed at the time of her surgery on August 5, 2009; make a further inference that the thrombus existed on August 11, 2009, when she was discharged from OSU; and, make a final inference that

---

[1]The court did not consider Dr. Jeffrey Breall's opinions regarding the existence of the thrombus at the time of plaintiff's admission in Billings because he was not timely identified regarding this subject matter as required by L.C.C.R. 7(E).

the thrombus found in Billings on July 18, 2009, was the proximate cause of her stroke on August 14, 2009.  The court cannot make these findings.  When plaintiff arrived at OSU she was given two tests which should have had the ability to diagnose a thrombus: an MRI and an echo.  Neither test detected a thrombus.  On the day of her surgery, August 5, 2009, plaintiff was given a TEE in the operating room which also did not detect a thrombus.  Further, on the date of her initial discharge from OSU, August 11, 2009, plaintiff underwent another echo which did not detect a thrombus.  Finally, when she returned to OSU after her stroke, on August 18, 2009, she was given a third OSU echo which did not produce evidence of a thrombus.  Thus, the court finds that there is not sufficient direct or circumstantial evidence to support plaintiff's claim that she had a left ventricle thrombus at anytime while she was treated at OSU.

{¶ 29} Plaintiff claims that Dr. Louis breached the standard of care by not prescribing Coumadin upon her discharge and/or by not obtaining informed consent regarding his decision not to prescribe Coumadin.  Plaintiff asserts that the following factors required Dr. Louis to prescribe Coumadin: (1) some doctors always prescribe Coumadin for 60 days after performing a coronary artery bypass with a mitral valve repair; (2) Dr. Louis did not fully oversew the atrial appendage; (3) there existed a left ventricle thrombus upon discharge; and (4) plaintiff's low ejection fraction.  The court has previously found that there is insufficient evidence to support a finding of a left ventricle thrombus at OSU which appears to be dispositive of this issue.  However, in dealing with the other three claims, there is no evidence that the oversew surgical procedure fell below the standard of care; there is no evidence to support a finding that failing to prescribe Coumadin after a coronary artery bypass with a mitral valve repair falls below the standard of care; and, plaintiff's ejection fraction had improved post-operatively and there is no expert testimony that a failure to prescribe Coumadin for a low ejection fraction was a breach of the standard of care.  The fact that some doctors may use a method or treatment different from that used by Dr. Louis does not, by itself,

prove Dr. Louis was negligent. *See Pesek v. Univ. Neurologists Assoc.,* 87 Ohio St.3d 495 (2000)

{¶ 30} The court is sympathetic to the severe injury plaintiff suffered. However, the fact that Dr. Louis' treatment resulted in a bad result does not by itself prove that he was negligent. *See Ault v. Hall,* 119 Ohio St. 422 (1928). The court finds no negligence attributed to Dr. Louis in his care and treatment of plaintiff while she was a patient at OSU and finds that he had no duty to inform plaintiff of a treatment that was not called for and, based upon the information he had at the time of her discharge, was not a material risk beyond which was discussed prior to surgery. A stroke is always a risk after open heart surgery and it was noted on the written informed consent document.[2] (Plaintiffs' Exhibit 4.) The court will further note that it appears that plaintiff has several theories of negligence on the part of Dr. Louis. However, she is unable to prove by a preponderance of the evidence which theory, if proved, was the proximate cause of her stroke. No doctor was able to opine, by a reasonable degree of medical certainty, where the thrombus came from that caused the stroke. The conventional theory was that it came from the heart; but where in the heart and whether it came from the original thrombus, a new thrombus or something else would be speculation.

{¶ 31} Given that the court finds that plaintiffs have failed to prove their claim of medical negligence, the derivative claim for loss of consortium must also fail. *Bowen v. Kil-Kare, Inc.,* 63 Ohio St.3d 84, 93 (1992).

{¶ 32} Based on the foregoing, judgment shall be rendered in favor of defendant.

---

[2]Plaintiff did not assert a claim of a lack of informed consent in the complaint. However, since the plaintiff's expert, Dr. Stone testified, without objection, that Dr. Louis fell below the standard of care by not obtaining plaintiff's informed consent upon discharge, the court has discussed and resolved the issue.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DEBORA HURSEY, et al.

    Plaintiffs

    v.

THE OHIO STATE UNIVERSITY

    Defendant

Case No. 2011-02140

Judge Dale A. Crawford

<u>JUDGMENT ENTRY</u>

{¶ 33} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
DALE A. CRAWFORD
Judge

cc:

Adam S. Davis
Marc K. Erickson
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112

Daniel R. Forsythe
Karl W. Schedler
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

John K. Fitch
580 South High Street, Suite 100
Columbus, Ohio 43215

004
Filed October 31, 2012
Sent to S.C. Reporter February 28, 2013